UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Citibank N.A.,                    :
                                  :
                Plaintiff,        :
                                  :    Case No. 2:11-cv-214
        v.                        :
                                  :
City of Burlington and McNeil,    :
Leddy & Sheahan, P.C.             :
                                  :
                Defendants.       :
                                  :

## Opinion and Order

This action arises out of a Master State and Municipal
Lease/Purchase Agreement (the "Master Lease Agreement" or "MLA")
under which the City of Burlington ("Burlington" or "the City")
secured funds for the lease-to-purchase of telecommunications
equipment (the "Equipment") and for the construction and
operation of a city-wide fiber optic network.  The City has used
the network to provide voice, data, and cable television
services through an entity known as Burlington Telecom ("BT").
After Burlington stopped appropriating funds to make payments
under the Master Lease Agreement, Citibank N.A. ("Citibank")
filed a fifteen-count complaint raising a variety of claims
against Burlington and McNeil, Leddy & Sheahan, P.C. ("McNeil"),
which served as counsel to the City.  After Citibank filed
motions to dismiss and strike Burlington's original Answer,

Burlington moved for leave to file an Amended Answer, ECF No. 56-2, which Citibank opposes in part.

For the reasons stated below, the Court **denies** Citibank's Motion to Strike, ECF No. 24; **grants in part and denies in part** Burlington's Motion to Amend, ECF No. 56; and **grants in part and denies in part** Citibank's Motion to Dismiss, ECF No. 25.

BACKGROUND[1]

In 1996, Burlington amended its charter to allow it to engage in regulated cable or telecommunications business, providing it complied with Vermont's requirements for public utilities. *See* Vt. Stat. Ann. tit 24A § 3-438(c)(1). The following year, Burlington's residents voted to approve the construction of a city-wide telecommunications network, which by 2003 was registered under the trade name Burlington Telecom. The construction of the network occurred in three phases: In Phase I, Burlington Telecom established a non-commercial network to provide telecommunications and data services to Burlington's municipal offices and schools. In Phase II, Burlington Telecom began providing commercial services to customers located within

---

[1] On a motion to dismiss a defendant's counterclaims, a court must accept the facts alleged by the defendant as true as well as all reasonable inferences in its favor. *See Vermont Hard Cider Co., LLC v. Ciolek*, No. 11-cv-00150, 2012 WL 761304 at *1 (D. Vt. Mar. 7, 2012); *see also Ashland Inc. v. Morgan Stanley & Co., Inc.*, 652 F.3d 333, 337 (2d Cir. 2011) (accepting as true all facts asserted by and inferences in favor of the non-moving party). Unless otherwise stated, the facts are taken from Burlington's Amended Answer and the uncontested portions of Citibank's Complaint and presented in the light most favorable to Burlington.

the reach of the Phase I network.  Finally, in Phase III, Burlington Telecom began building out its commercial network with the goal of being able to provide service to every residence, business, and institution in the City of Burlington.

Burlington obtained approval for Burlington Telecom from Vermont's Public Service Board ("PSB"), which imposed a number of conditions on the enterprise to ensure that the City's construction and operation of the network would comply with Vermont law and serve the public interest.  When the PSB approved the project in 2005, it issued a Certificate of Public Good ("CPG") containing a number of conditions, among them the requirement that

> In no event shall any losses or costs, in the event the enterprise is abandoned or curtailed, incurred by BT be borne by the City of Burlington taxpayers, the City of Burlington Electric Department ("BED") ratepayers or the state of Vermont, nor shall the City of Burlington expend any funds received from the State of Vermont to cover any losses or costs, in the event the enterprise is abandoned or curtailed, incurred by BT, as provided in [Vt. Stat. Ann. tit. 24 App. § 3-438(c)(1)].

ECF No. 14-7 § 56.  The CPG also stated that while Burlington Telecom could participate in Burlington's pooled cash management system, Burlington Telecom had to "reimburse the City within two months of the City's expenditure for any expenses incurred or payments made by the City in support of services that BT provides to non-City entities."  *Id.* § 60.

Koch Financial initially provided financing for all three stages of the network's construction to the tune of more than $22 million; however, in June 2007, Burlington announced that it would seek additional funds to continue BT's Phase-III build out and to refinance its existing debt.  A Vermont organization, Municipal Leasing Consultants ("MLC"), won the bidding process but acted as a middle man rather than providing the financing itself.  Under this arrangement, MLC negotiated the terms of the Master Lease Agreement with the expectation that it would later assign its rights and obligations under the agreement with Burlington to CitiCapital Municipal Finance ("CitiCapital").

Burlington alleges that prior to entering the Master Lease Agreement, the City expressed concern that the Master Lease Agreement might prevent it from seeking financing from other lenders in the event that it required additional funds for Burlington Telecom's expansion within the City and to surrounding areas.  According to Burlington, MLC provided assurances that CitiCapital would provide such financing in the event it was required after CitiCapital assumed the MLA.  The City also claims that it then entered into a separate agreement with CitiCapital for additional financing (the "Additional Financing Agreement" or "AFA").  "Under the agreement, Burlington would approach Citibank rather than issuing an RFB as it had done with the initial financing."  Am. Answer

4

(Counterclaims) ¶ 17.  According to Burlington, "[CitiCapital] in effect promised to proceed in good faith and work together with Burlington when the additional financing became necessary." *Id.* ¶ 18.

On August 9, 2007, Burlington and MLC signed the Master Lease Agreement.  Six days later, on August 15, MLC assigned its duties, obligations, rights, title, and interests to CitiCapital.  The Master Lease Agreement included two schedules: Schedule No. 001 provided approximately $11.5 million for the purchase of new equipment as part of Burlington Telecom's Phase III built-out; Schedule No. 002 involved approximately $22 million that Burlington used to buy out Koch Financial and to re-lease the existing equipment from MLC (and, after August 15, CitiCapital).  The total financing commitment was $33.5 million.

The Master Lease Agreement contains multiple provisions governing Burlington's rental payments for use of the equipment, default, termination, and potential remedies for the parties. The MLA goes into particular detail about the nature of the property rights held by the parties.  Paragraph 11, entitled "Title: Security Agreement," provides that title to the equipment will vest with the Lessee upon acceptance of it.  The same paragraph further provides that the "Lessee shall immediately surrender possession of that Equipment to Lessor" in the event that the Lease terminates for either of two reasons:

(1) the expiration of the lease term (initial or renewal) and the nonrenewal of the lease due to nonappropriation by the City; or (2) the occurrence of an Event of Default, including, among other things, the failure of the Lessee to make a rental payment with respect to that Lease. *See* MLA ¶¶ 4, 11, 20.  In the event of default, the MLA gives the Lessor the right to retake or demand return of the equipment from the Lessee five days after delivering written notice to the Lessee. *Id.* ¶ 21.  For the purpose of the instant motions, the Master Lease Agreement's merger clause is also of particular relevance.  It states:

> ENTIRE AGREEMENT.  This Master Lease, together with the exhibits attached hereto and other attachments hereto, and other documents or instruments executed by Lessee and Lessor in connection herewith, constitute the entire agreement between the parties with respect to the lease of the Equipment, and this Master Lease shall not be modified, amended, altered or changed except with the written consent of Lessee and Lessor.

MLA § 29.

On August 9, Burlington also entered into an Escrow Trust Agreement with CitiCapital Municipal Finance (the "Escrow Agreement").  The Escrow Agreement created two separate funds: an acquisition fund with approximately $10.5 million for the purchase of new equipment and a reserve fund of $1 million that CitiCapital could access to prevent a default in the event that Burlington failed to make a payment.

As part of the negotiation process, CitiCapital sought assurances that Burlington had sufficient revenue from non-taxpayer services to make the required payments to CitiCapital. In a letter dated August 17, 2007, Burlington's counsel, McNeil, Leddy & Sheahan P.C. ("McNeil") provided Burlington and Citibank with an "Opinion Letter" stating,

> There is no prohibition of utilizing general fund revenues of the City for telecommunications activities.  However, there is a specification that losses from telecommunications are not to be borne by the City's taxpayers, the State of Vermont or recovered in rates from electric ratepayers.  The same restriction applies to costs incurred in the event of any abandonment or curtailment of the telecommunication systems by the City.  We are advised that approximately 40% of general fund revenues are derived from other sources than through taxation of the City's taxpayers.

Compl. Ex. B.

In February 2008, Burlington sought additional funding from CitiCapital pursuant to what Burlington claims was a prior understanding that either MLC or CitiCapital would supplement the funding provided in the Master Lease Agreement.  At around the same time, though, Citibank entered negotiations to sell CitiCapital's municipal leasing portfolio.  In advance of the prospective sale, CitiCapital instituted a moratorium on new business and, according to Burlington, simply refused to negotiate new financing terms.  Burlington did not obtain additional funds from CitiCapital, and after the credit market collapsed in the fall of 2008, no other financing options

materialized.   Between 2008 and February 2010, Burlington used
approximately $17 million in city funds to support Burlington
Telecom's ongoing operation, including $3.4 million in lease
payments to CitiCapital.   Meanwhile, in September 2009,
CitiCapital purportedly assigned its rights under the Master
Lease Agreement to Citibank.

In September 2009, Burlington Telecom failed to comply with
the CPG condition that it reimburse Burlington within two months
of any expenditures but appealed to the PSB for relief from that
requirement.   Three months later, in December, two residents and
taxpayers of the City of Burlington brought a state lawsuit
against Burlington Telecom for its misuse of the City's pooled
cash.   On February 12, 2010, the Chittenden County Superior
Court entered a stipulated order preventing the City from making
additional payments to Burlington Telecom unless those payments
were authorized by the PSB.   *See Osier v. Burlington Telecom*,
Docket No. S1588-09 CnC (Chittenden Cnty. Sup. Ct).   That
permission was not forthcoming: on February 16, 2010, the PSB
denied Burlington's request for relief from the conditions of
the CPG.   In the wake of those decisions, Burlington informed
Citibank that it would be unable to make a lease payment due on
February 17, 2010.   As a result, Citibank began to draw from the
$1 million escrow fund the following month to prevent an
automatic default.

8

On June 28, 2010, Burlington adopted a budget for 2011 that contained no appropriation for payment of its rental obligations under the Master Lease Agreement.  The same day, Burlington and Citibank entered into an agreement (the "June Agreement") in which the parties agreed to forbear taking any legal action for a period that by stipulation ultimately lasted until the end of October, 2010.  As part of the June Agreement, Citibank and Burlington agreed to negotiate a potential resolution to their dispute in good faith.  The June Agreement also included a "No Waivers Clause," which states,

> The parties acknowledge and agree that each shall retain
> all rights and remedies they may now have with respect to
> the [Master] Lease Agreement and, except as set forth
> herein, this shall not constitute a waiver of any such
> rights.  The City represents and warrants, however, that
> there are no claims or offsets against or defenses (other
> than an event of nonappropriation) or counterclaims to its
> obligations under the [Master] Lease Agreement.

June Agreement ¶ 3, ECF No. 25-2.

During the forbearance period, Burlington hired an outside consultant, Terry Dorman of Dorman & Fawcett, to come up with a plan for restructuring Burlington Telecom.  In a letter to Citibank, Dorman proposed what he billed as a "commercially reasonable" plan for restructuring the Master Lease Agreement. Terry Dorman Letter to Bernadette Walsh (August 27, 2010) at *2, ECF No. 47-3.  Dorman suggested resetting the principal due on the MLA to $1,200 per BT customer, shrinking it to a total of

less than $6 million.  *Id.* at *1.  Under Dorman's proposal,
Citibank would have the option to recalculate the principal once
during an 18-month window if Burlington Telecom expanded its
customer base, and Citibank would also be entitled to half of
any excess proceeds BT collected.  Citibank rejected the
proposal.  In its response, Citibank stated that it expected
"'Burlington to repay [Citibank] in full the money advanced in
accordance with the terms of the [Master] Lease Agreement,'" as
well as holdover rent of $480,241.63.  Am. Answer at *60.

On October 5, Burlington representatives, including Dorman,
participated in a conference call with Citibank representatives.
Citibank officials informed Burlington "that Citibank was unable
to craft a commercially reasonable workout for BT because of
Citibank's TARP status." *Id*.  Dorman sent a follow up letter on
October 21, expressing frustration that TARP might be holding up
a mutually beneficially solution to the impasse.  In response,
Citibank reiterated its demand for full repayment and requested,
if Burlington did not do so by the end of the forbearance
period, that it begin de-installing the Equipment.  Citibank
noted that "[s]pecific delivery instructions shall be provided
under separate cover." Am. Answer at *61 (internal quotation
omitted).  The parties continued discussing how Burlington might
return the Equipment subject to the Master Lease Agreement.
Burlington, concerned that immediate de-installation would not

only be disruptive to its private customers but also to the city's agencies that use Burlington Telecom, made proposals for like-kind exchanges or a gradual return of the Equipment; however, according to Burlington, Citibank never indicated when or how it expected Burlington to facilitate the return.

In September 2011, Citibank filed a fifteen-count Complaint against Burlington and McNeil, ECF No. 1.  Counts I through VIII of Citibank's Complaint seek various remedies from Burlington under the Master Lease Agreement, while Counts IX through XIII present alternative theories of relief against Burlington, including rescission, unconstitutional impairment of contracts, and default lease provisions under the Uniform Commercial Code. *Id.*  Count XIV is a claim for negligent misrepresentation against McNeil.  Count XV, also against McNeil, has been dismissed.  *See Mem. Op. & Order*, ECF No. 54; *Citibank v. City of Burlington* (*Citibank I*), No. 2:11-cv-214, 2012 WL 2050730 (D. Vt. June 7, 2012) (granting in part and denying in part McNeil's Mot. to Dismiss, ECF No. 17).

Burlington filed a timely answer that included nineteen affirmative defenses and twelve counterclaims; however, it seeks to amend that filing by adding one affirmative defense, dropping two of its original counterclaims, and adding five new counterclaims.  *See Def's Mot. to Am.*, ECF No. 56. Counterclaims I through V of Burlington's Amended Answer relate

11

to the additional financing Burlington sought for its Phase III financing in 2008.   Counterclaims VI through VIII arise out of the June Agreement.   And Counterclaims IX through XV address the legal rights and obligations of the parties regarding Burlington Telecom's infrastructure.

## DISCUSSION

## I.   Citibank's Motion to Strike

Citibank moves to strike all references to its participation in the federal government's Troubled Asset Relief Program ("TARP") in Burlington's original answer under Rule 12(f).   Because Burlington has not altered its references to TARP in its amended answer, Citibank's objections apply with equal force to that document.   *Compare* Pl.'s Mot. Strike at *2, ECF No. 24 (listing each reference to TARP), *with* Am. Answer at *23, 26, 61.

Rule 12(f) permits a court to strike "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).   Nonetheless, motions to strike are generally disfavored by federal courts and are infrequently granted.   *See* 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1380 (3d ed.).   "In order to succeed on a motion to strike, it must be shown that the allegations being challenged are so unrelated to plaintiff's claims as to be unworthy of any consideration as a defense and that their

presence in the pleading throughout the proceeding will be
prejudicial to the moving party." *Bank of Vermont v.
Lyndonville Sav. Bank & Trust Co.*, 906 F. Supp. 221, 228 (D. Vt.
1995) (internal quotation omitted).  A Rule 12(f) motion to
strike "will be denied, unless it can be shown that no evidence
in support of the allegation would be admissible." *Lipsky v.
Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).

Burlington claims that Citibank, not Burlington, was the
first to raise Citibank's TARP status during negotiations
between the parties in the fall of 2010 as an explanation for
why it was unable to renegotiate the Master Lease Agreement
("MLA") with Burlington.  In a conference call between
representatives of Burlington and Citibank on October 5, 2010,
Citibank informed Burlington that it could not continue working
on a revised Lease Agreement because the bank was under
increased federal scrutiny as a result of its TARP status.
Because it would be premature to conclude that Citibank's TARP
status is irrelevant to Burlington's counterclaims and
affirmative defenses without further factual development, the
Court denies Citibank's motion to strike without prejudice.

II.  **Burlington's Motion to Amend and Citibank's Motion to
     Dismiss**

Burlington moves to amend its answer pursuant to Federal
Rule of Civil Procedure 15(a)(2).  Leave to amend is granted

freely "when justice so requires," *id.*, and typically is not denied "unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility." *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001). When a party interposes a proposed amended pleading to combat a motion to dismiss, leave to amend is "denied as futile only if the proposed new claim cannot withstand a 12(b)(6) motion to dismiss for failure to state a claim." *Id.*[2] Accordingly, Burlington's Amended Answer must "'contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 555 U.S. at 678.

### A.    The "No Waivers" Clause of the June Agreement

Contrary to its name, the "No Waivers" Clause of the parties' June Agreement purports to limit Burlington's legal rights and remedies. In its entirety, it reads,

---

[2] Citibank need not re-file its motion to dismiss simply because it preceded Burlington's motion to amend. *See* 6 Wright, *et al.*, Fed. Prac. & Proc. § 1476 ("[D]efendants should not be required to file a new motion to dismiss simply because an amended pleading was introduced while their motion was pending. If some of the defects raised in the original motion remain in the new pleading, the court simply may consider the motion as being addressed to the amended pleading.").

> <u>No Waivers</u>. The parties acknowledge and agree that
> each shall retain all rights and remedies they may now
> have with respect to the [Master] Lease Agreement and,
> except as set forth herein, this shall not constitute
> a waiver of any such rights. *The City represents and
> warrants, however, that there are no claims or offsets
> against or defenses (other than an event of non-
> appropriation) or counterclaims to its obligations
> under the [Master] Lease Agreement.*

June Agreement § 3 (emphasis added).  Citibank claims that this

language bars Burlington from raising counterclaims based on

acts or omissions that occurred prior to June 28, 2010, the date

the June Agreement was signed.  Pl.'s Mem. in Opp'n to Mot. to

Amend, at *4, ECF No. 59-1.  Burlington, meanwhile, argues that

the No Waivers Clause only constitutes a waiver of claims

directly related to its obligations under the Master Lease

Agreement; for that reason, Burlington believes it is free to

raise counterclaims and affirmative defenses based on other

contracts or on non-contract theories.  Def.'s Mem. in Supp. of

Mot. to Amend, at *6, ECF No. 62.  By this view, the No Waivers

Clause does not impact counterclaims based on the purported

"Additional Financing Agreement" (Counterclaims I-V), those

based on the June Agreement itself (Counterclaims VI-VIII), or

the remaining counterclaims, which deal with the parties'

ownership, rights, and responsibilities in conjunction with BT's

equipment (Counterclaims IX-XV).

Where a contract's language is clear and unambiguous, a

court may dismiss a breach of contract claim on a Rule 12(b)(6)

15

motion to dismiss. *Maniolos v. United States*, 741 F. Supp. 2d
555, 567 (S.D.N.Y. 2010) (citing *Advanced Mktg. Group, Inc. v.
Bus. Payment Sys., LLC,* 300 Fed.Appx. 48, 49 (2d Cir. 2008)
("Judgment as a matter of law is appropriate if the contract
language is unambiguous.") (internal quotation omitted)). Here,
the phrase that does the most work and that renders the No
Waivers Clause narrow and clearly defined is its specific
reference to Burlington's "obligations under the [Master] Lease
Agreement." June Agreement § 3. The No Waivers Clause plainly
precludes Burlington from bringing claims or counterclaims that
would alter the express terms of the Master Lease Agreement.
Because the term "Lease Agreement" encompasses the Escrow
Agreement, Burlington is also obligated to abide by its terms.
*See* MLA § 1 (defining "Schedule" to include attachments to the
Master Lease Agreement, which include the Escrow Agreement);
Escrow Agreement § 1, ECF No. 1-5. Furthermore, it is clear
from the language of the June Agreement that the parties
intended for the No Waivers Clause to foreclose Burlington from
raising claims or offsets that would materially alter its
obligations under the Master Lease Agreement. *See N. Aircraft,
Inc. v. Reed*, 572 A.2d 1382, 1388 (Vt. 1990) ("When an
instrument is clear and unambiguous, we look to its plain
meaning to determine the understanding and intent of the
parties. The law presumes the parties intended to be bound by

the plain and express language of their contracts as they are
written.") (internal citation omitted).  The Master Lease
Agreement includes a number of specific obligations: it requires
Burlington to pay rent to Citibank while the agreement is
active, MLA § 5; to maintain the Equipment in good repair and
make no additions to it without Citibank's consent, MLA §§ 13-
18; to indemnify Citibank against certain losses, MLA § 19; and
to return the Equipment upon termination, MLA § 7.  These
obligations are among those to which Burlington was plainly
referring when it represented that there were "no claims or
offsets against or defenses (other than an event of non-
appropriation) or counterclaims to its obligations under the
[Master] Lease Agreement."  June Agreement § 3.

    Counterclaims IX-X and XII-XIV and affirmative defenses 2
and 3 address various issues relating to the ownership and
status of the Equipment.  Counterclaim IX asks for a declaratory
judgment that the Equipment not be removed until Burlington and
Citibank can come to a "commercially reasonable method for
returning the Equipment that is acceptable to the Public Service
Board."  Am. Answer ¶ 78.  Counterclaim X notes the public and
private functions served by Burlington Telecom and requests an
order from the Court directing Citibank "to operate and maintain
the Equipment necessary to allow BT's customers, the public
safety and emergency preparedness services to continue to

receive telecommunications services." Am. Answer ¶ 201. In Counterclaim XII, Burlington seeks a declaratory judgment that it and Citibank are "Tenants-in-Common" with respect to the Equipment and Burlington Equipment combined, while Counterclaim XIV asserts that Citibank has a fiduciary duty to Burlington arising out of the parties' purported tenancy in common. And Counterclaim XIII suggests that the Master Lease Agreement is a security agreement and that Citibank has violated its duty to act in a commercially reasonable manner with respect to the Equipment, the collateral under the MLA. According to Burlington, Citibank violated this duty by failing to act in good faith to maintain the value of the Equipment, rejecting commercially reasonable alternatives to a disruptive return of the Equipment, and never providing instructions for the Equipment's return. In its second affirmative defense, Burlington suggests that Citibank has waived its rights to the Equipment under the Master Lease Agreement by failing to instruct Burlington where to return the Equipment, to negotiate in good faith, or to file suit in a timely manner. Burlington's third affirmative defense is one of estoppel: because Burlington made capital investments in BT's infrastructure during a period in which Citibank failed to make a timely request return of the Equipment, Burlington should be precluded from seeking removal. Each of these counterclaims and affirmative defenses would have

the effect of reworking the Master Lease Agreement's framework for transfer of ownership and return of the Equipment and would fall afoul of the No Waivers Clause.  Citibank's motion to dismiss is therefore granted with respect to Counterclaims IX and X, and Burlington's motion for leave to is denied with respect to Counterclaims IX, X, XII, XIII, and XIV as well as affirmative defenses 2 and 3.

### B.   The Additional Financing Agreement (Counterclaims I-V)

Counterclaims I through V relate to an alleged oral commitment by CitiCapital to provide or to negotiate in good faith to provide additional financing for Burlington Telecom's Phase III buyout.  Citibank argues that each of these counterclaims is barred by the No Waivers Clause; however, Citibank has not explained how any of these alleged promises would, if enforced, impact Burlington's obligations under the Master Lease Agreement.  The Court therefore turns to Citibank's other objections Counterclaims I through V.

### 1.   Counterclaim I: Breach of Contract (AFA)

In Counterclaim I, Burlington alleges that during the negotiations over the Master Lease Agreement, CitiCapital and Burlington entered into a separate, binding contract to negotiate in good faith additional financing for Burlington Telecom's build-out.  Specifically, Burlington alleges that MLC was CitiCapital's partner and agent, that through MLC,

19

CitiCapital became aware that Burlington would require additional financing for the continued build-out of BT, that CitiCapital agreed to negotiate in good faith about additional financing, and that Burlington relied on CitiCapital's representation when it entered into the Master Lease Agreement. Burlington alleges that CitiCapital's failure to negotiate in good faith led to damages of over $70 million stemming from a drop in Burlington Telecom's enterprise value as well as the City's credit rating.

In response, Citibank first claims that the Additional Financing Agreement is unenforceable as a matter of law because it contravenes the Merger Clause in the Master Lease Agreement as well as Vermont's parol evidence rule.  A merger clause "confirms that the contract is 'adopted by the parties as a *complete and exclusive* statement of the terms of the agreement.'"  *Hoeker v. Dep't of Soc. & Rehab. Servs.*, 765 A.2d 495, 499 (Vt. 2000) (quoting Restatement (Second) of Contracts § 210 (1981)).  The Merger Clause in the Master Lease Agreement provides:

> ENTIRE AGREEMENT. This Master Lease, together with the exhibits attached hereto and other attachments hereto, and other documents or instruments executed by Lessee and Lessor in connection herewith, constitute the entire agreement between the parties with respect to the lease of the Equipment, and this Master Lease shall not be modified, amended, altered or changed except with the written consent of Lessee and Lessor.

MLA § 29.  Vermont's parol evidence rule "bar[s] enforcement of
a prior or contemporaneous oral agreement that varies or
contradicts the terms of the written agreement."  *Hoeker*, 765
A.2d at 499.  Citibank contends that the Merger Clause precludes
the enforcement of any additional financing agreements between
the parties, particularly because the Master Lease Agreement
encompassed "other documents or instruments executed by Lessee
and Lessor in connection herewith."  MLA ¶ 29.

Accepting Burlington's allegations as true and interpreting
all inferences in the City's favor, the Court finds that the
Additional Financing Agreement and the Master Lease Agreement
could plausibly represent "two independent contracts covering
different subject matter [that] govern the same transaction."
*Hoeker*, 765 A.2d at 499; *see also United Park Ass'n v.
Ringuette*, 719 A.2d 884, 887 (Vt. 1998) ("We recognize that
under general contract law independent contracts related to the
same subject matter can coexist to the extent that they are not
clearly inconsistent."); *Chappell v. N. Realty, Inc.*, 266 A.2d
453, 456 (Vt. 1970) (finding two separate agreements in a real
estate transaction—a written deed and an oral contract to make
repairs to the property on which the buyer relied in signing the
deed).  Burlington does not allege that the Additional Financing
Agreement varied the terms of the Master Lease Agreement, nor
does Burlington allege that the parties were bound to any

21

particular outcome; rather, Burlington claims that it had an oral agreement with CitiCapital to negotiate additional financing in good faith.[3]  Simply stated, the fact that Burlington and CitiCapital closed a massive refinancing deal that culminated in the Master Lease Agreement does not necessarily mean that Burlington has not stated a plausible claim for relief based on a separate agreement.

Whether a promise to negotiate in good faith is enforceable raises a separate question.  "Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise."  Restatement (Second) of Contracts § 77 cmt. a (1981).  Even when parties agree to structure their dealings in a certain manner, their agreement is unenforceable if it is not "definite and explicit so their intention may be ascertained to a reasonable degree of certainty."  *Candid Productions, Inc. v. Int'l Skating Union*, 530 F. Supp. 1330,

---

[3] In its original motion to dismiss, Citibank contends that the Additional Financing Agreement violates Vermont's statute of frauds. Citibank appears to drop this argument in its subsequent briefing, with good reason.  The statute of frauds requires that parties reduce to writing, *inter alia*, "[a]n agreement not to be performed within one year from the making thereof."  Vt. Stat. Ann. tit. 12, § 181. However, the rule is no barrier where, as here, the contract could have been performed within a year.  *Bonfanti v. Ayers*, 365 A.2d 268, 270 (Vt. 1976) ("The Statute of Frauds is not applicable here since the transaction was one which could have been performed prior to the expiration of one year, and the fact that the time of performance is uncertain or may extend beyond one year does not aid defendant . . . .").

1333-34 (S.D.N.Y. 1982).  In some jurisdictions, an offer to negotiate simply cannot be the foundation for a binding accord, *see, e.g., C & S Acquisitions Corp. v. Nw. Aircraft, Inc.*, 153 F.3d 622, 626 (8th Cir. 1998) (applying Minnesota law); *see also* E. Allan Farnsworth, *Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations*, 87 Colum. L. Rev. 217, 264 (1987) (noting the skepticism these promises met at common law); however, a growing majority of courts enforce contractual obligations to negotiate in good faith, as long as the conditions for those negotiations are adequately defined. *See Keystone Land & Dev. Co. v. Xerox Corp.*, 353 F.3d 1093, 1097 (9th Cir. 2003) (citing examples).

Neither the Vermont Supreme Court nor this Court has addressed the whether a promise to negotiate in good faith is illusory or enforceable under Vermont law, but both have addressed a conceptually similar topic: whether preliminary agreements containing some terms on which the parties have agreed and others they wish to further hammer out are enforceable.  *See, e.g., Catamount Slate Products, Inc. v. Sheldon*, 2003 VT 112, ¶ 17, 845 A.2d 324, 329 ("We look to the intent of the parties to determine the moment of contract formation."); *Bixler v. Bullard*, 769 A.2d 690, 694 (Vt. 2001); *Sunnyside Cogeneration Assocs. v. Cent. Vt. Pub. Serv. Corp.*, 915 F. Supp. 675, 680 (D. Vt. 1996) ("Under Vermont law, for a

preliminary agreement to be enforceable, it must contain all material and essential terms to be incorporated in the subsequent contract."). In so doing, both Courts have tapped a vein of precedent within the Second Circuit interpreting New York law that is also relevant to the instant issue of contracts to negotiate in good faith. *See Bixler v. Bullard*, 769 A.2d 690, 694 (Vt. 2001); *Sunnyside Cogeneration Assocs.*, 915 F. Supp. at 680. In a seminal decision, then-District Judge Pierre Leval outlined two types of potentially enforceable preliminary agreements. *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498-99 (S.D.N.Y. 1987). The first type "occurs when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation." *Id.* at 498. Such an accord is "preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement." *Id.* These so-called "Type I" agreements are fully enforceable as to all of their terms. *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005). In Type II agreements, by contrast, the parties may establish a loose framework for negotiations without agreeing on specific terms, obligating themselves only "to negotiate the open issues in good faith." *Tribune*, 670 F. Supp. at 498; *see Brown*, 420 F.3d at 153. Parties to Type II agreements leave themselves the freedom to walk away once they have satisfied the

24

obligation to pursue an accord in good faith, *Tribune*, 670 F. Supp. at 498, but they may violate that obligation by "'renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.'" *FCOF UB Sec. LLC v. MorEquity, Inc.*, 663 F. Supp. 2d 224, 228 (S.D.N.Y. 2009) (quoting *Tribune*, 670 F. Supp. at 498). On its face, the AFA most closely resembles a Type II agreement. Burlington does not allege that the parties agreed to any specifics or to the timing of any future financing; the parties' sole obligation was to negotiate in good faith.

To determine whether Type II agreements like this are enforceable, courts look to several factors, including: "(1) whether the intent to be bound is revealed by the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." *Id.* at 157. Burlington claims that it has performed its part of the bargain by asking CitiCapital to negotiate future financing in February 2008; however, the remaining factors weigh heavily against concluding that the parties had a binding agreement about additional financing. Burlington does not allege that there was any documentation, whether contractual or preliminary, of the Additional Financing Agreement. *USA Mach. Corp. v. CSC, Ltd.*,

25

184 F.3d 257, 264 (3d Cir. 1999) (finding intent to be bound lacking where there was scant documentation of the scope of the parties' commitment). The context in which these alleged promises were made also suggests that they were not binding. CMF and Burlington were in the process of completing a $33.5 million lease-purchase agreement with extensive written terms. It seems likely that they would have adopted similar formalities if they intended to be bound by an additional agreement. To the extent that any agreement existed to negotiate additional financing, the terms of that agreement were almost completely open. Burlington describes no agreed-upon framework for negotiations, except that Burlington could apparently at any later date make a request of CitiCapital to refinance. *See Penguin Group (USA) Inc. v. Steinbeck*, 06-cv-2438, 2009 WL 857466 at 2 n.2 (S.D.N.Y. Mar. 31, 2009) (noting the "vital terms" must be definite for New York courts to uphold good faith negotiation clauses); *Candid Productions, Inc*, 530 F. Supp. at 1336 (finding bare agreement to negotiate in good faith was "unenforceable for indefiniteness"). It is also difficult to imagine that, had refinancing been as essential and immediate a need as Burlington now alleges, Burlington would pin its chance to obtain new funds on a hope that "good faith" negotiations would resolve in its favor. For these reasons, Counterclaim I fails to state a claim for breach of a Type II agreement.

Nonetheless, Counterclaim I may survive under a theory of promissory estoppel.  Promissory estoppel arises "'where there is no agreement, where the promise is gratuitous, and there is unbargained-for-reliance.'"  *Heathcote Associates v. Chittenden Trust Co.*, 958 F. Supp. 182, 188 (D. Vt. 1997) (quoting *Chomicky v. Buttolph*, 513 A.2d 1174, 1176 (Vt. 1986)).  Promissory estoppel can save a contract claim when "injustice can be avoided only through the enforcement of the promise," *Green Mountain Inv. Corp. v. Flaim*, 807 A.2d 461, 464 (Vt. 2002); however, even under this theory, "[a] promise can be so illusory that any action in reliance on it cannot be effective." *Overlock v. Cent. Vt. Pub. Serv. Corp.*, 237 A.2d 356, 359 (Vt. 1967).  Vermont courts have not addressed whether a promise to negotiate in good faith under a promissory estoppel rationale, but there is support for that proposition in other jurisdictions.  *See Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 74 (2d Cir. 1989) (determining plaintiff raised questions of fact warranting trial on whether a promise to negotiate in good faith, reached during detailed negotiations, and in reliance on which the plaintiff made extensive preparations, could be enforceable by virtue of promissory estoppel); *Dixon v. Wells Fargo Bank, N.A.*, 798 F. Supp. 2d 336, 339-48 (D. Mass. 2011) (permitting a promissory estoppel claim to proceed past the pleadings stage, while acknowledging it

would stretch Massachusetts law, based on an unfulfilled oral promise by Wells Fargo to homeowners facing foreclosure that if they stopped making payments on their mortgage, the bank would modify the mortgage's terms); *see also* 4 Williston on Contracts § 8:7 (4th ed.) (noting many courts are willing to adopt a more flexible view of the required definiteness of a promise in the promissory estoppel context than in relation to full contracts).

Burlington does not explicitly raise a promissory estoppel theory in its amended answer, but promissory estoppel need not be pleaded as a separate cause of action.  Under the Restatement (Second) of Contracts (and in many states), "[a] promise binding under [a promissory estoppel theory] is a contract, and full-scale enforcement by normal remedies is often appropriate."  *Id.* § 90 (1981); *see also Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1106 (9th Cir. 2009) (noting that in most states promissory estoppel is not its own cause of action but a substitute for consideration in a breach of contract claim).  Whether Burlington's allegations establish a plausible claim for promissory estoppel may be a close call, but "Rule 12(b)(6) dismissals are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development." *Baker v. Cuomo*, 58 F.3d 814, 818-19 (2d Cir. 1995), *vacated in part on other grounds*, *Baker v. Pataki*, 85 F.3d 919 (2d Cir. 1996) (en banc); *see also*

*McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004) (quoting *Baker*, 58 F.3d at 818-19). Because the legal merits of this claim—viewed through the lens of a promissory estoppel theory—will be best assessed after further factual development, the Court grants Burlington's motion to amend and denies Citibank's motion to dismiss with respect to Counterclaim I.

### 2. Counterclaim II: Breach of Contract (AFA and the MLA After-Acquired Property Clause)

In Counterclaim II, Burlington relies on substantially the same facts as in Counterclaim I but seeks to strike a clause in the Master Lease Agreement that gives CitiCapital a security interest in any Equipment acquired by Burlington Telecom after the exhaustion of proceeds from CitiCapital. Unlike Counterclaim I, Counterclaim II frames the Additional Financing Agreement as an "express promise" tethered to the Master Lease Agreement's after-acquired property clause and a condition for Burlington to enter the Master Lease Agreement. In other words, Burlington suggests that the Additional Financing Agreement augmented a portion of the Master Lease Agreement. This argument runs afoul of the Merger Clause, which states that the MLA and its attachments "constitute the entire agreement between the parties with respect to the lease of the Equipment . . . ." MLA ¶ 29. For that reason, the Court denies Burlington's motion

to amend and grants Citibank's motion to dismiss with respect to

Counterclaim II.

### 3. Counterclaim III: Negligent Misrepresentation (AFA)

Counterclaim III is for negligent misrepresentation.

Vermont has adopted the Restatement definition of negligent

misrepresentation, which provides,

> One who, in the course of business, profession or
> employment, or in any other transaction in which he
> has a pecuniary interest, supplies false information
> for the guidance of others in their business
> transaction is subject to liability for pecuniary loss
> caused to them by their justifiable reliance upon the
> information, if he fails to exercise reasonable care
> or competence in obtaining or communicating the
> information.

*Citibank I*, 2012 WL 2050730, at *4-5 (quoting Restatement

(Second) of Torts § 552(a) (1977)).

Burlington alleges that through MLC Citibank knew that

Burlington would require financing in addition to the $33.5

million Citibank provided in the Master Lease Agreement,

promised to negotiate in good faith with Burlington at a future

date, and that Citibank's promise constituted a false statement

because Citibank did not ultimately conduct good-faith

negotiations when Burlington sought them.  At base, Counterclaim

III is little more than an allegation that Citibank was

negligent in failing to stand by its promise to negotiate in

good faith.  But under Vermont law, "[a] statement of intent to

30

perform a contractual commitment will not support a claim for
negligent misrepresentation." *Gerling-Kinzern Gen. Ins. Co.--
U.K. Branch v. Noble Assur. Co.*, No. 06-cv-76, 2006 WL 3251491
at *11 (D. Vt. Nov. 1, 2006) (citing *Howard v. Usiak*, 775 A.2d
909, 913–14 (Vt. 2001)).  Were the rule otherwise, any negligent
breach of contract might constitute a tort.  *Howard*, 775 A.2d at
913.  Because Counterclaim III does not state a plausible claim
for relief under Vermont law, the Court denies Burlington's
motion to amend and grants Citibank's motion to dismiss with
respect to Counterclaim III.

### 4.  Counterclaim IV: Fraudulent Inducement to Enter the MLA

In Counterclaim IV, Burlington alleges that CitiCapital
fraudulently induced Burlington to enter the Master Lease
Agreement by intentionally misrepresenting that it would
negotiate in good faith to provide additional financing for
Burlington Telecom.  To state a claim for fraudulent inducement,
a party must plead facts demonstrating "an intentional
misrepresentation of fact affecting the essence of the
transaction, false when made and known to be false by the maker,
not open to the defrauded party's knowledge, and relied upon by
the defrauded party to its damage." *Ben & Jerry's Homemade,
Inc. v. La Soul, Inc.*, 983 F. Supp. 504, 506 (D. Vt. 1997)
(citing *Union Bank v. Jones*, 411 A.2d 1338, 1342 (Vt. 1980)).  A

31

party alleging fraudulent inducement must meet Federal Rule of
Civil Procedure 9(b)'s heightened standards for pleading fraud.
*Eaves v. Designs for Finance, Inc.*, 785 F. Supp. 2d 229, 246-47
(S.D.N.Y. 2009); *see* Fed. R. Civ. P. 9(b) ("In alleging fraud or
mistake, a party must state with particularity the circumstances
constituting fraud or mistake.  Malice, intent, knowledge, and
other conditions of a person's mind may be alleged generally.").
Rule 9(b) requires that a pleading "'(1) specify the statements
that the plaintiff contends were fraudulent, (2) identify the
speaker, (3) state where and when the statements were made, and
(4) explain why the statements were fraudulent.'"  *Rombach v.
Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar
Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  Under Rule
9(b), the pleading must also "'allege facts that give rise to a
strong inference of fraudulent intent . . . [either] by (1)
alleging facts to show that defendants had both motive and
opportunity to commit fraud, or by (2) alleging facts that
constitute strong circumstantial evidence of conscious
misbehavior or recklessness.'"  *Bergman v. Spruce Peak Realty,
LLC*, 847 F. Supp. 2d 653, 674 (D. Vt. 2012) (quoting *S.Q.K.F.C.,
Inc. v. Bell Atl. TriCon Leasing Corp.,* 84 F.3d 629, 634 (2d
Cir. 1996)).  The allegation that a party concealed information
intentionally provides some of evidence of motive or

recklessness, but standing alone, it is insufficient to pass muster. *Id*.

Burlington alleges each of the elements of fraudulent inducement. Burlington contends "on information and belief" that CitiCapital knew that it would not be able negotiate with Burlington in good faith at the time it promised to do so. Burlington also alleges that CitiCapital made the false statement to induce Burlington to sign the MLA, and, that Burlington, unaware of its falsity, relied on that promise to its damage. Nevertheless, Burlington presents no facts that give rise to a strong inference of CitiCapital's fraudulent intent. Burlington does not contend, for example, that CitiCapital officials stood to gain substantial commissions or bonuses by the transaction. Nor has Burlington argued that CitiCapital was reckless in its negotiations with Burlington. In short, Burlington fails to allege any facts creating a strong inference that CitiCapital knew or had reason to know that it was inducing Burlington to sign the Master Lease Agreement by deceit. Accordingly, the Court grants Citibank's motion to dismiss and denies Burlington's motion to amend with respect to Counterclaim IV.

### 5. Counterclaim V: The Implied Covenant of Good Faith and Fair Dealing (AFA)

Counterclaim V alleges that CitiCapital violated the implied covenant of good faith and fair dealing by not negotiating an additional financing agreement and by failing to inform Burlington that it was exiting the municipal leasing business.  The implied covenant of good faith and fair dealing is implied by law in all contracts, to protect against "conduct which violates community standards of 'decency, fairness or reasonableness.'"  *Harsch Properties, Inc. v. Nicholas*, 2007 VT 70, ¶ 14, 932 A.2d 1045, 1050 (quoting *Carmichael v. Adirondack Bottled Gas Corp.*, 635 A.2d 1211, 1216 (Vt. 1993)).  There can be no implied covenant claim where there is no contractual relationship between the parties.  *Id.; see also Monahan v. GMAC Mort. Corp.*, 2005 VT 110, ¶ 54 n.5, 893 A.2d 298, 316 n.5 ("A cause of action for breach of the covenant of good faith can arise only upon a showing that there is an underlying contractual relationship between the parties . . . .").  Nor do Vermont courts "recognize a separate cause of action for violation of the covenant of good faith and fair dealing where a plaintiff pleads a breach of contract claim *based on the same conduct*." *Sherman v. Ben & Jerry's Franchising, Inc.*, No. 08-CV-207, 2009 WL 2462539 at *6 (D. Vt. Aug. 10, 2009) adhered to on reconsideration, 2009 WL 3579763 (D. Vt. Oct. 26, 2009) (emphasis added) (citing *Monahan*, 2005 VT 110, ¶ 54 n.5, 893 A.2d at 316 n.5).

34

Because Counterclaim I states a valid breach of contract claim under a theory of promissory estoppel, Burlington may argue that the terms of that contract included the implied covenant of good faith and fair dealing; however, because Counterclaim V is premised on precisely the same conduct as Counterclaim I, it cannot survive as an independent cause of action.  *Id*. at *6.  For that reason, the Court grants Citibank's motion to dismiss and denies Burlington's motion to amend with respect to Counterclaim V.

### C.   The June Agreement (Counterclaims VI-VIII)

Counterclaims VI through VIII relate to the June Agreement. Citibank contends, without elaboration, that all three counterclaims are barred by the No Waivers Clause, a component of the June Agreement.  *See* June Agreement ¶ 3.  As explained above, the No Waivers Clause states in part that "[Burlington] represents and warrants . . . that there are no claims or offsets against or defenses (other than an event of nonappropriation) or counterclaims to its obligations *under the [Master] Lease Agreement*."  *Id.* (emphasis added).  Because the parties' promises in conjunction with the June Agreement do not impact Burlington's obligations under the Master Lease Agreement, Counterclaims VI through VIII are not barred by the No Waivers Clause.

### 1.  Counterclaim VI: Breach of Contract (June Agreement)

In Counterclaim VI, Burlington alleges that Citibank breached the June Agreement by failing to negotiate in good faith in the face of Burlington's proposals to amend the terms of the Master Lease Agreement.  Burlington further alleges that as a result, it lost the remaining Reserve Fund money, totaling $226,745.76 and that it was also forced to pay Dorman & Fawcett to assemble a proposal for Burlington Telecom that Citibank was never going to accept from the outset.  In response, Citibank contends that Burlington has failed to plead facts that specifying how Citibank breached its promise to negotiate in good faith.

To make out a claim for violation of a contractual duty to employ "good faith," a party "must 'allege the specific instances or acts that amounted to the breach'; 'generalized allegations and grievances' will not suffice to survive a motion for judgment on the pleadings."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 431 (2d Cir. 2011) (quoting *U.S. ex rel. Smith v. New York Presbyterian Hosp.*, No. 06—cv-4056, 2007 WL 2142312, at *16 (S.D.N.Y. July 18, 2007)).  The Restatement (Second) of Contracts defines "good faith" as "'honesty in fact in the conduct or transaction concerned.'"  *Id.* § 205 (1981) cmt. a (quoting Uniform Commercial Code § 1-201(19)).  An

"'agreement to agree buys a party an assurance that the transaction will falter only over a genuine disagreement, thus allowing a party strapped for time or money to go ahead with arrangements with a sufficient degree of confidence in the outcome.'" *L-7 Designs*, 647 F.3d at 430 (quoting *P.A. Bergner & Co. v. Martinez*, 823 F. Supp. 151, 156 (S.D.N.Y. 1993)).  To determine when a party acts in bad faith, "courts have had to look for subtler manifestations such as refusing to disclose information relevant to the negotiations, rejecting routine provisions, shifting bargaining positions when agreement is near, engaging in dilatory tactics, or withholding agreement on trivial matters." Farnsworth, 87 Colum. L. Rev. at 272.  Bad faith negotiating behavior may include a "refusal to negotiate, improper tactics, unreasonable proposals, nondisclosure, negotiation with others, reneging, and breaking off negotiations." *Id.* at 273.

Here, Burlington's Amended Answer spells out Citibank's alleged failures to negotiate in good faith with sufficient specificity to raise a plausible claim for relief.  Burlington's allegations that Citibank immediately rejected Dorman & Fawcett's proposal, otherwise failed to compromise, and used TARP as an excuse not to negotiate a refinancing deal together establish a plausible claim that Citibank did not negotiate in good faith.  For that reason, the Court denies Citibank's motion

37

to dismiss and grants Burlington's motion to amend with respect
to Counterclaim VI.

### 2. Counterclaim VII: Breach of the Implied Covenant of Good Faith and Fair Dealing (June Agreement)

In Counterclaim VII, Burlington alleges that Citibank
violated the implied covenant of good faith and fair dealing by
failing to negotiate in good faith for the purpose of creating
an "*in terrorem* environment" by which Citibank could extract
further concessions from Burlington than available under the
Master Lease Agreement.  Am. Answer at *70.  As explained above,
Vermont does not recognize separate causes of action for breach
of the implied covenant of good faith and fair dealing and
breach of contract when both claims are premised on the same
conduct.  *See Sherman*, No. 08-cv-207, 2009 WL 2462539, at *6
(citing *Monahan*, 2005 VT 110, ¶ 54 n.5, 893 A.2d at 316 n.5).
Because Burlington's Counterclaim VII for breach of the implied
covenant of good faith and fair dealing rests on the same
underlying facts as Burlington's Counterclaim VI for breach of
contract, the Court grants Citibank's motion to dismiss and
denies Burlington's motion to amend with respect to Counterclaim
VII.

### 3. Counterclaim VIII: Fraudulent Inducement (June Agreement)

In Counterclaim VIII, Burlington alleges that Citibank
fraudulently induced it to sign the June Agreement with the

38

intent to use its bargaining position to secure extra-
contractual remedies from Burlington.  To state a claim for
fraudulent inducement, a party must allege "an intentional
misrepresentation of fact affecting the essence of the
transaction, false when made and known to be false by the maker,
not open to the defrauded party's knowledge, and relied upon by
the defrauded party to its damage."  *Ben & Jerry's Homemade*, 983
F. Supp. at 506.  The allegations must also comply with Rule
9(b)'s relatively stringent requirements for pleading fraudulent
intent.  *Bergman*, 847 F. Supp. 2d at 653.

Burlington's Amended Answer establishes the basic elements
of the claim.  It identifies a specific statement—Citibank's
written promise "to continue, in good faith, [the parties']
negotiations"—and alleges that Citibank knew it to be false
because Citibank had no intention to continue negotiating in
good faith.  Am. Answer at *71.  Burlington also claims that it
relied on Citibank's representation to generate compromise
proposals that Citibank rejected out of hand and that Burlington
suffered losses in the process.

Whether Burlington has alleged facts giving rise to a
strong inference of fraudulent intent presents a closer
question.  Burlington may satisfy its burden either by "(1)
alleging facts to show that defendants had both motive and
opportunity to commit fraud, or by (2) alleging facts that

constitute strong circumstantial evidence of conscious
misbehavior or recklessness.'" *Bergman*, 847 F. Supp. 2d at 674
(quoting *S.Q.K.F.C.,* 84 F.3d at 634).  Here, Burlington alleges
that Citibank officials knew as early as 2009 that its TARP
status would prevent it from negotiating a commercially
reasonable solution with Burlington.  Am. Answer at *72.
Burlington also alleges that Citibank simply repeated its
demands for full payment when Burlington approached it with *bona
fide* proposals to restructure BT.  *Id.*  These allegations are
sufficient to create a strong inference of conscious misbehavior
on the part of Citibank.  Accordingly, the Court denies
Citibank's motion to dismiss and grants Burlington's motion to
amend with respect to Counterclaim VIII.

### D.   Counterclaims XI and XV (Burlington's Equipment)

In Counterclaims XI and XV, Burlington seeks declaratory
judgments stating that Burlington is the owner of infrastructure
that it added pursuant to its own, independent investment in
Burlington Telecom's fiber optic network.  Because Citibank does
not oppose amendment of these counterclaims, the Court grants
Burlington's motion to amend with respect to Counterclaims XI
and XV.

### E.   Burlington's Affirmative Defenses

Citibank opposes Burlington's motion to amend with respect
to six of Burlington's affirmative defenses.  A party's motion

40

to amend its affirmative defenses will be denied when the
proposed defenses are meritless and amendment is therefore
futile.  *Quanta Specialty Lines Ins. Co. v. Investors Capital
Corp.*, 403 F. App'x 530, 532 (2d Cir. 2010).  As noted above,
Burlington's motion is denied with respect to affirmative
defenses 2 and 3 because they are futile in light of the No
Waivers Clause; however, Citibank's other objections to
affirmative defenses 8, 11, 15, and 20 remain.

### 1.    Affirmative Defense 8: Assumption of Risk

In affirmative defense 8, Burlington claims that Citibank
assumed the risk of loss if Burlington failed to appropriate
funds to carry the Master Lease Agreement through its final
term.  Burlington also claims that Citibank assumed the risk
that the return of the Equipment would be subject to complex
regulations, including the requirement that de-installation be
commercially reasonable and approved by the PSB.  Citibank
counters by arguing that it assumed no risk that Burlington
would "negligently or fraudulently induce it to enter into the"
Master Lease Agreement, or that Burlington would "intentionally
breach" the agreement.  Pl.'s Opp'n to Def.'s Mot. to Amend at
*12.

"A plaintiff who by contract or otherwise expressly agrees
to accept a risk of harm arising from the defendant's negligent
or reckless conduct cannot recover for such harm, unless the

41

agreement is invalid as contrary to public policy." Restatement (Second) of Torts § 496B (1965). As an affirmative defense, the assumption of risk "has no application unless there is knowledge of the existence of the risk, together with an appreciation of the extent of the danger." *Killary v. Burlington-Lake Champlain Chamber of Commerce, Inc.*, 186 A.2d 170, 174 (Vt. 1962). In this case, the pleadings and inferences therefrom suggest that Citibank may have known that it faced the risk that Burlington would not appropriate funds to fulfill its obligations under the Master Lease Agreement. As such, Burlington's assumption of risk defense is not plainly futile at this point. The Court therefore grants Burlington's motion to amend with respect to affirmative defense 8.

### 2.   Affirmative Defense 11: Mitigation of Damages

In affirmative defense 11, Burlington claims that Citibank failed to mitigate its damages because Citibank "has, in bad faith, made demands on Burlington which are commercially and practicably infeasible, and Plaintiff repeatedly refused Burlington's offers and ceased negotiations." Am. Answer at *46. "[T]he nonbreaching party in a contract dispute has a duty to make reasonable efforts to mitigate damages arising from the breach." *Estate of Sawyer by Howard Bank v. Crowell*, 559 A.2d 687, 692 (Vt. 1989). It is known by turn "as the doctrine of 'avoidable consequences,' in recognition of the fact that an

42

injured party should not be able to recover damages for loss that could have been avoided with reasonable effort." *O'Brien v. Black*, 648 A.2d 1374, 1376 (Vt. 1994).

Citibank claims that it has stood by its longstanding demand for immediate return of the Equipment under the terms of the Master Lease Agreement. *See* Pl.'s Opp'n to Def.'s Mot. to Amend at *13. Citibank also argues that it was not required to accept alternative settlement offers rather than receive what it is owed by contract, *id.*; however, Burlington contends that Citibank never provided it with basic instructions regarding when or where it would like the Equipment returned and therefore failed to mitigate its losses from the delay in the return of the equipment. Am. Answer at *46. The explicit terms of the Master Lease Agreement provide that "Lessee agrees, at Lessee's cost and expense, to peaceably deliver the Equipment then subject to that Lease to Lessor *at the location or locations to be specified by Lessor*." MLA ¶ 7 (emphasis added). Read in the light most favorable to Burlington, that provision supports Burlington's claim that Citibank was required to specify where the equipment was to be returned. At this point, the Court therefore cannot determine that Burlington's mitigation of damages defense is plainly futile. For that reason, the Court grants Burlington's motion to amend with respect to affirmative defense 11.

### 3.   Affirmative Defense 15

In affirmative defense 15, Burlington claims that it cannot perform its responsibilities under the Master Lease Agreement because doing so would be "commercially impractical."  Am. Answer at *47.  Although this defense may ultimately be barred by the No Waivers Clause, Burlington did not alter this defense in its amended answer.  For that reason, Citibank's opposition to Burlington's motion to amend is moot with respect to this affirmative defense.

### 4.   Affirmative Defense 20: Lack of Capacity to Sue

In affirmative defense 20, Burlington claims that Citibank lacks standing to maintain this action because neither Citibank nor its predecessor in interest, CitiCapital, ever obtained a certificate of authority to conduct business in Vermont.  Under the Vermont Business Corporation Act, Vt. Stat. Ann. tit. 11A, § 15.01 *et seq.* (2013), "[a] foreign corporation transacting business in this state without a certificate of authority may not maintain a proceeding or raise a counterclaim, crossclaim or affirmative defense in any court in this state until it obtains a certificate of authority."  Vt. Stat. Ann. tit. 11A, § 15.02.

This defense raises the question of whether Vermont's registration requirements for foreign corporations are preempted by federal law when applied to national banks.  The doctrine of federal preemption is grounded in the Supremacy Clause of the

44

United States Constitution, which provides that "the Laws of the
United States . . . shall be the supreme Law of the Land; and
the Judges in every State shall be bound thereby, any Thing in
the Constitution or Laws of any State to the Contrary
notwithstanding." U.S. Const. art. VI, cl. 2. "Preemption can
generally occur in three ways: where Congress has expressly
preempted state law, where Congress has legislated so
comprehensively that federal law occupies an entire field of
regulation and leaves no room for state law, or where federal
law conflicts with state law." *Wachovia Bank, N.A. v. Burke*,
414 F.3d 305, 313 (2d Cir. 2005).

"[A] national bank . . . is an 'instrumentalit[y] of the
Federal government, created for a public purpose, and as such
necessarily subject to the paramount authority of the United
States.'" *Marquette National Bank of Minneapolis v. First of
Omaha Service Corp.,* 439 U.S. 299, 308 (1978) (quoting *Davis v.
Elmira Savings Bank,* 161 U.S. 275, 283 (1896)). National banks
are subject to the laws of the states in which they operate
unless those laws "'interfere with the purposes of their
creation, tend to impair or destroy their efficiency as federal
agencies, or conflict with the paramount law of the United
States.'" *Bank of Am., Nat. Trust & Sav. Ass'n v. Lima*, 103 F.
Supp. 916, 917 (D. Mass. 1952) ("*Bank of Am.*") (quoting *First
Nat. Bank in St. Louis v. State of Missouri at inf. Barrett*, 263

U.S. 640, 656 (1924)).  Under the National Banking Act, 12

U.S.C. § 1, *et seq.*, a national bank has the power "[t]o sue and

be sued, complain and defend, in any court of law and equity, as

fully as natural persons."  12 U.S.C. § 24.  As the Ninth

Circuit has explained,

> [Section 24] is part of the scheme of federal laws
> governing the duties and powers of federally chartered
> banks. "Congress has legislated in the field of banking
> from the days of *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.)
> 316, 4 L.Ed. 579 (1819), creating an extensive federal
> statutory and regulatory scheme." *Bank of Am.,* 309 F.3d at
> 558. The purpose of this scheme was "to facilitate what
> Representative Hooper termed a 'national banking system,' "
> *Marquette Nat'l Bank v. First of Omaha Serv. Corp.,* 439
> U.S. 299, 315 (1978) (footnote and citation omitted), and
> "to protect national banks against intrusive regulation by
> the States," *Bank of Am.*, 309 F.3d at 561.

*Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 982 (9th Cir. 2005).

Several courts have held that a state may not require

national banks to register as a foreign corporation to do

business or maintain lawsuits within the state.  *See Bank of*

*Am.*, 103 F. Supp. at 918 (ruling that Massachusetts could not

require national banking institutions to fulfill conditions

before filing suit in the state); *Williams v. Chase Bank USA,*

*N.A.*, 390 S.W.3d 824, 828 (Ky. Ct. App. 2012) (determining that

12 U.S.C. § 24 preempted a Kentucky statute requiring a foreign

corporation to obtain a certificate of authority to maintain a

proceeding in the state); *770 PPR, LLC v. TJCV Land Trust*, 30

So. 3d 613, 618 (Fla. Dist. Ct. App. 2010) ("[A] state cannot

require a national bank to register or file as a 'foreign

corporation'; in order to maintain a lawsuit in state court.");

*State Nat. Bank of Conn. v. Laura*, 256 N.Y.S.2d 1004, 1006

(Westchester Co. Ct. 1965) ("[S]ince a national bank is brought

into existence under federal legislation, it does not come

within New York's statutory requirements limiting the right of

foreign corporations to sue.").  A similar conclusion is

required here: Vermont may not require a national bank to

register as a foreign corporation before it maintains a lawsuit

in a court within the state; such requirements plainly conflict

with 12 U.S.C. § 24 and are therefore preempted.  For this

reason, the Court denies Burlington's motion to amend with

respect to affirmative defense 20.

### CONCLUSION

For the reasons detailed above, the Court takes the

following actions: First, the Court **denies**, without prejudice,

Citibank's motion to strike (ECF No. 24) references to TARP in

Burlington's Amended Answer.  Second, the Court **grants in part**

**and denies in part** Citibank's motion to dismiss, ECF No. 25.

The Court dismisses Counterclaims II, III, IV, V, and VII

because each fails to state a plausible claim for relief against

Citibank, but the Court denies Citibank's motion with respect to

the remaining counterclaims.  Finally, the Court **grants in part**

**and denies in part** Burlington's motion to amend its answer,

affirmative defenses, and counterclaims, ECF No. 56.  Leave to amend is granted with respect to Counterclaims I, VI, VIII, XI, and XV as well as affirmative defenses 8 and 11 but denied with respect to Counterclaims II, III, IV, V, VII, IX, X, XII, XIII, and XIV as well as affirmative defenses 2, 3, and 20.

Affirmative defense 15 also remains because it is unamended.

Dated at Burlington, in the District of Vermont, this 13th day of September, 2013.

/s/William K. Sessions III_____
William K. Sessions III
U.S. District Court Judge