UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

```
                              :
Citibank N.A.,                :
                              :
                Plaintiff,    :
                              :       Case No. 2:11-cv-214
        v.                    :
                              :
City of Burlington and McNeil,:
Leddy & Sheahan, P.C.,        :
                              :
                Defendants.   :
                              :
```

## Opinion and Order

This action arises out of a Master State and Municipal
Lease/Purchase Agreement ("Master Lease Agreement" or "MLA")
between the City of Burlington ("Burlington" or "the City") and
Citibank as the purported assignee of CitiCapital Municipal
Finance ("CitiCapital").  The MLA is a lease-purchase agreement
regarding telecommunications equipment ("the Equipment") used to
develop Burlington's city-wide fiber optic network.  Citibank's
primary security interest under the agreement is title to and
possession of the Equipment, both of which immediately revert to
Citibank in the event of termination of the Lease Agreement.  In
June 2010, Burlington declined to appropriate funds to pay its
obligations under the MLA.  After Burlington failed to return
the Equipment to Citibank pursuant to the terms of the MLA,
Citibank filed a fifteen-count Complaint, ECF No. 1, against

1

Burlington and the law firm of McNeil, Leddy & Sheahan.  Counts
I and II seek equitable relief mandating that Burlington
deinstall and return the Equipment to Citibank under the terms
of the MLA.  *Id.* at 17-20.  Burlington now moves for summary
judgment on multiple grounds.  First, the City seeks summary
judgment dismissing the entire complaint based on Citibank's
lack of standing to bring the action.  Second, it seeks summary
judgment dismissing Citibank's requests for equitable relief
under Counts I and II.  Third, it argues that the Court should
invoke the primary jurisdiction doctrine and refer Counts I and
II to the Vermont Public Service Board ("PSB").  For the reasons
stated below, the Court **DENIES** Burlington's Motion for Summary
Judgment, ECF No. 116, in its entirety.

## BACKGROUND

### I. Master Lease Agreement

In 1997, Burlington voters approved the construction of a
city-wide telecommunications network, which eventually became
known as Burlington Telecom ("BT").  BT's construction was
planned to occur in three phases.  Phase I would establish a
non-commercial network to provide telecommunications services to
municipal offices and schools.  Phase II would extend BT
services to private customers already within the reach of the
Phase I network.  Phase III would build out the commercial
network to every residence and business in the City.  BT was

2

initially funded through two lease agreements with Koch
Financial, which provided approximately $22.6 million for the
project.

In 2007, Burlington sought funds to continue Phase III of
the build-out plan.  A Vermont organization, Municipal Leasing
Consultants ("MLC") won the bid but assigned its rights and
obligations under the future agreement to CitiCapital Municipal
Finance ("CitiCapital") to actually provide the funds.  On
August 9, 2007, Burlington and MLC executed the Master Lease
Agreement.  The Master Lease Agreement provided approximately
$11.5 million for the purchase of new equipment as part of BT's
Phase III build-out as well as an additional $22 million that
Burlington used to buy out Koch Financial and re-lease the
existing equipment.  The total financing commitment under the
MLA was $33.5 million.

The MLA is subject to annual appropriation by Burlington's
City Council.  Hence, Paragraph 7 of the Master Lease Agreement
provides:

> NONAPPROPRIATION.  Lessee[1] is obligated only to pay
> such Rental Payments under this Master Lease as may
> lawfully be made from funds budgeted and appropriated
> for that purpose during Lessee's then current fiscal
> year.  Lessor cannot compel Lessee to levy ad valorem
> taxes to make Rental Payments.  Should Lessee fail to
> budget, appropriate or otherwise make available funds
> to pay Rental Payments under a Lease following the

---

[1] The terms "Lessee" and "Lessor" are used throughout this Opinion as used in
the Master Lease Agreement, and correspond to Burlington and Citibank as the
purported assignee of CitiCapital, respectively.

then current Initial Term or Renewal Term, that Lease
shall be deemed terminated at the end of the then
current Initial Term or Renewal Term.  Lessee agrees
to deliver notice to Lessor of such termination at
least 90 days prior to the end of the then current
Initial Term or Renewal Term, but failure to give such
notice shall not extend the term beyond such Initial
Term or Renewal Term.  If a Lease is terminated in
accordance with this Section, Lessee agrees, at
Lessee's cost and expense, to peaceably deliver the
Equipment then subject to that Lease to Lessor at the
location or locations to be specified by Lessor.

MLA, Compl. Ex. C, ¶ 7, ECF No. 1-3.  In addition, Paragraph 11
directs that title to the Equipment will vest with the Lessee
upon acceptance provided that the Lessee immediately surrenders
possession of the Equipment to the Lessor in the event that the
lease terminates.  *Id.* ¶ 11.  Termination may occur for either
of two reasons: (1) the expiration of the lease term (initial or
renewal) and the nonrenewal of the lease due to the City's
nonappropriation; or (2) the occurrence of an event of default,
including, among other things, the failure of the Lessee to make
a rental payment with respect to the Lease Agreement.  *See id.*
¶¶ 4, 11, 20.  In the event of default, the MLA gives the Lessor
the right to retake or demand return of the equipment from the
Lessee five days after delivering written notice to the Lessee.
*Id.* ¶ 21.

## II.  Assignment to Citibank

The Master Lease Agreement also allows the Lessor to assign
its rights under the Lease without consent of the Lessee,

effective "upon receipt by the Lessee of a duplicate original of the counterpart document by which the assignment or reassignment is made, disclosing the name and address of each such assignee and, where applicable, to whom further payments hereunder should be made." *Id.* ¶ 23.

On or about August 15, 2007, MLC assigned its rights under the MLA to CitiCapital.  MLC sent Burlington a notice of assignment and a duplicate original of the assignment, as required by the MLA.  Both parties agree that this effected a proper assignment to CitiCapital, and that CitiCapital duly succeeded MLC as the Lessor under the MLA.  *See* Burlington's Statement of Undisputed Facts in Support of Mot. Summ. J. ("Burlington's Facts") ¶ 6–7, ECF 116-2.  The chain of assignments then becomes rather complicated.  According to Burlington's Facts, the MLA has been assigned as follows:

a) Between August 15, 2007 and June 22, 2009, [CitiCapital] assigned its rights to CitiMortgage, Inc.
b) On or about June 22, 2009, CitiMortgage, Inc. assigned the Master Lease Agreement to Citibank, N.A.
c) On or about September 30, 2009, [CitiCapital] assigned the Master Lease Agreement "by and through its trustee Citibank, N.A." to Citibank, N.A.

*Id*. ¶ 16.  Burlington alleges that it was not properly notified with respect to any of these assignments, and therefore maintains that Citibank cannot be a proper party to this action.

Citibank disputes the City's version of the events.  In response to Burlington's Facts, Citibank states that CitiCapital was a grantor trust[2] with CitiMortgage, Inc. as Initial Depositor and Citibank as Trustee.  In an assignment dated June 22, 2009, CitiMortgage, Inc. made Citibank (in its corporate capacity and not as a Trustee) the sole Unitholder in the trust.  Pl.'s Statement of Disputed Material Facts in Support of Pl.'s Obj. to Def.'s Mot. Summ. J. ("Citibank's Facts") ¶ 15, ECF 145-2.  On September 23, 2009, Citibank in its corporate capacity gave notice to Citibank as Trustee that it wished to terminate the Trust Agreement and dissolve the grantor trust.  After Citibank gave notice that it wished to terminate and dissolve the grantor trust, CitiCapital ceased to exist, and all of its property and rights were sold or assigned.  On September 30, 2009, CitiCapital (by and through its Trustee, Citibank) assigned all of its right, title, and interest in the MLA to Citibank in its corporate capacity.  *Id.*

On September 30, 2009, Citibank sent a "Notice of Assignment and Acknowledgement of Assignment" ("Notice") to Burlington that read:

---

[2] A grantor trust is a trust wherein the grantor is treated as the owner for purposes of taxation of the trust assets until those trust assets are distributed to the grantee.  *See* 26 U.S.C.A. § 671; *Resolution Trust Corp. v. MacKenzie*, 60 F.3d 972, 976–77 (2d Cir. 1995) (discussing grantor trusts).

> CITICAPITAL MUNICIPAL FINANCE by and through its
> trustee Citibank NA has Assigned all of its right,
> title and interest in the above-referenced Security
> Agreement (and the Equipment covered thereby and all
> other rights relating thereto) to CITIBANK NA.

Burlington's Facts ¶ 17.  Burlington states in its Facts that no

one from Citibank at the Preliminary Injunction hearings could

testify that a copy of the Notice was sent to the City.  *Id.* ¶

18.  Burlington also asserts that the City never received the

Notice or copies of the assigning document regarding the

assignment to Citibank.  *Id.* ¶ 22-23.  However, Citibank

counters that Burlington's receipt and acknowledgment of the

Notice is evidenced by the fact that Burlington sent its

November 17, 2009 rental payment directly to Citibank.

Citibank's Facts ¶ 15.

After the hearings, Citibank's counsel forwarded an

"Assignment.pdf," dated June 22, 2009, to Burlington that read:

> For good and valuable consideration, the receipt and
> adequacy of which is hereby acknowledged,
> CITIMORTGAGE, INC. hereby sells, transfers, delivers
> and assigns to CITIBANK, N.A., without recourse, all
> of its right, title and interest in, to and under the
> Citicapital Municipal Finance Trust Units identified
> on Exhibit A attached hereto.

*Id.* ¶ 20.

## III. Termination of the Master Lease Agreement

In spring of 2010, Burlington declined to appropriate the

funds necessary to pay Citibank the rental payments scheduled

for the upcoming fiscal year.  Burlington claimed that it could

not make payments under the MLA because it had no legally
available funds.  After an agreed-upon forbearance period that
extended through October 2010, Burlington again failed to
appropriate funds to make payments under the Agreement.  In a
letter dated October 21, 2010, Citibank demanded the
deinstallation and the return of the Equipment pursuant to
Paragraphs 7 and 11 of the MLA.  *See* Compl. Ex. F.  The letter
also informed Burlington that if the City continued to use the
Equipment, Citibank would require Burlington to pay holdover
rent, and that Citibank reserved its right to seek rescission of
the Agreement.  However, according to Burlington, Citibank did
not indicate at that time when, where, or how the Equipment
ought to be returned.  Burlington's Facts ¶ 106.[3]  Burlington has
not rescinded the Agreement, but it began paying a percentage of
Burlington Telecom's net cash flow to Citibank pursuant to a
Court Order on March 27, 2012.  Joint Stip. & Order Mar. 27,
2012, ECF No. 45.  As of the date of this decision, BT has
continued to use the Equipment in its operations.  Burlington
has put forth several alternative restructuring and repayment
proposals, all of which have been rejected by Citibank.

In September 2011, Citibank filed a fifteen-count Complaint
against Burlington and McNeil, Leddy & Sheahan ("McNeil"),

---

[3] According to Burlington, Citibank first specified a delivery location
on November 27, 2012.  Burlington's Facts ¶ 106.

Burlington's legal counsel during the formation of the Lease Agreement.  Counts I through VIII seek remedies from Burlington under the MLA, Counts IX through XIII present alternative theories of relief against Burlington, and Count XIV is a claim for negligent misrepresentation against McNeil.  Count XV has been dismissed.  *See* Mem. Op. & Order June 7, 2012, ECF No. 54; *Citibank v. City of Burlington ("Citibank I")*, No. 2:11-cv-214, 2012 WL 2050730 (D. Vt. June 7, 2012).  Burlington filed a timely answer that included nineteen affirmative defenses and twelve counterclaims, which were later amended to ten affirmative defenses and fifteen counterclaims.  Def.'s Mot. Am., ECF No. 56.  Citibank moved to dismiss Burlington's counterclaims, which this Court granted in part and denied in part.  *See* Op. & Order Sept. 13, 2013, ECF 204; *Citibank v. City of Burlington ("Citibank II")*, No. 2:11-cv-214, 2013 WL 4958645 (D. Vt. Sept. 13, 2013).  The Court also granted in part and denied in part Burlington's motion to amend its answer, affirmative defenses, and counterclaims.  *See id.*  On December 31, 2012, Burlington filed the Motion for Summary Judgment currently before the Court.

## IV.  The Public Service Board

The Public Service Board ("PSB") is a quasi-judicial agency with powers of a court of record "in the determination and adjudication of all matters over which it is given

jurisdiction." Vt. Stat. Ann. tit. 30, § 9.  The PSB is
designated by statute as the agency responsible for regulating
telecommunications within Vermont.  *Id.* §§ 203(5) and 502(b).
The PSB has jurisdiction "so far as may be necessary to enable
[it] to perform the duties and exercise the powers conferred
upon [it] by law." *Id.* § 203(5).  The Public Service Board is
the "franchising authority in the state empowered to grant,
renew and revoke certificates of public good for all cable
television systems and shall have all other authority to
regulate cable television systems." *Id.*

Under the Burlington City Charter, the City must obtain a
certificate of public good from the Public Service Board before
selling telecommunications or cable television services.  Vt.
Stat. Ann. tit. 24A, § 3-431(4).  If the City exercises its
authority under § 431(4), the PSB must ensure that losses from
these businesses "in no event are borne by the city's taxpayers,
the state of Vermont, or are recovered in rates from electric
ratepayers."  Vt. Stat. Ann. tit. 24A, § 3-438(c)(1).

The PSB issued a Certificate of Public Good ("CPG") to
Burlington Telecom on September 13, 2005.  The CPG included a
condition that read:

> 56.  In no event shall any losses or costs, in the
> event the enterprise is abandoned or curtailed,
> incurred by BT be borne by the City of Burlington
> taxpayers, the City of Burlington Electric Department
> ("BED") ratepayers or the state of Vermont, nor shall

the City of Burlington expend any funds received from
the State of Vermont to cover any losses or costs, in
the event the enterprise is abandoned or curtailed,
incurred by BT, as provided in 24 V.S.A. App. § 3-
438(c)(1).

CPG, ¶ 56, ECF No. 14-7.  The CPG also provided that Burlington

Telecom could participate in the City's pooled cash management

system, but that it would be required to "reimburse the City

within two months of the City's expenditure for any expenses

incurred or payments made by the City in support of services

that BT provides to non-City entities."  *Id*. ¶ 60.

In September 2009, BT failed to comply with the

reimbursement condition of the CPG.  The City appealed to the

PSB for relief from the requirement, which was eventually denied

on February 16, 2010.  In December 2009, two Burlington

taxpayers brought a state lawsuit against BT for its misuse of

the pooled cash.  *See Osier v. Burlington Telecom*, Docket No.

S1588-09 CnC (Chittenden Cnty. Sup. Ct.).  When addressing BT's

motion to dismiss, the presiding judge invoked the doctrine of

primary jurisdiction to stay the plaintiffs' claims and directed

them to instead seek intervention in BT's proceedings before the

PSB.  *See Osier*, Ruling on Mot. Dismiss, May 11, 2010, ECF No.

116-17.

## DISCUSSION

Burlington's Motion for Summary Judgment seeks to dismiss

Citibank's Complaint on three grounds.  Burlington asks that the

Court dismiss the Complaint on the theory that Citibank does not have standing or authority to maintain this action because Citibank failed to comply with the MLA's express assignment provisions and because neither CitiCapital nor Citibank obtained a certificate of authority to transact business in Vermont.  The City also argues that the Court should grant summary judgment dismissing Counts I and II (the counts seeking equitable relief) based on public policy, economic waste, unreasonable hardship, unenforceable penalty, lack of mitigation, and equitable estoppel considerations.  In the alternative, the City asks the Court to defer to the primary jurisdiction of the Public Service Board with respect to Counts I and II.

On a motion for summary judgment, the party seeking summary judgment (here, Burlington) bears the responsibility of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only when no rational jury could find in favor of the nonmoving party may summary judgment be granted to the moving party. *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 721 (2d Cir. 1994). Thus, the Court must resolve all ambiguities and draw all reasonable inferences in favor of Citibank when assessing Burlington's Motion.

**I. Standing**

Burlington argues that Citibank's entire Complaint should be dismissed for lack of standing.  Burlington challenges Citibank's standing on two bases.  First, Burlington claims that Citibank is not a proper assignee under the MLA because it never effectuated a valid assignment pursuant to the assignment provisions of the MLA and because it failed to meet required pleading standards.  Second, Burlington contends that Citibank lacks standing because it never obtained a certificate of authority to transact business in Vermont.  As a result of these alleged deficiencies, the City argues that Citibank does not have the authority to bring this action.  These two arguments are addressed individually below.

### A. Assignment

Burlington asserts that Citibank does not have standing to maintain this action because it was never properly assigned the rights, title, and interest in the Equipment under the Master Lease Agreement.  Paragraph 23 of the MLA permits the Lessor to assign its rights without the consent of the Lessee, "effective upon receipt by Lessee of a duplicate original of the counterpart document by which the assignment or reassignment is made, disclosing the name and address of each such assignee and . . . to whom further payments hereunder should be made."  MLA, ¶ 23.  According to Burlington, the original Lessor, MLC, properly assigned its rights under the lease to CitiCapital and

sent notice of this assignment on August 15, 2007.  However, Burlington states that CitiCapital never sent proper notice to the City when it assigned the Lease over to Citibank.  As a result, Burlington contends that Citibank does not have standing to bring this action under the MLA.

The details of the assignments are admittedly confusing. According to Citibank's Facts, CitiCapital[4] was established as a grantor trust with another entity, CitiMortgage, Inc., acting as the Initial Depositor and Citibank as Trustee.  Citibank's Facts ¶ 15.  In an assignment dated June 22, 2009, CitiMortgage made Citibank (in its corporate capacity and not as Trustee) the sole Unitholder in the trust.  Thus, at that point, Citibank was both CitiCapital's Trustee and sole Unitholder.  On September 23, 2009, Citibank as Unitholder gave notice to Citibank as Trustee that it wished to terminate the Trust Agreement and dissolve the grantor trust.  *Id.*  Upon termination, CitiCapital ceased to exist and all of its assets were assigned or sold to other entities.  On September 30, 2009, CitiCapital assigned all of its right, title, and interest in the MLA to Citibank in its corporate capacity.  *Id.*

---

[4] CitiCapital is a subsidiary of Citibank that was created to book tax exempt transactions like the Lease Agreement with Burlington.  *Id.* ¶ 10; Burlington's Facts ¶ 11.  The MLA was only one of the many similar business arrangements that CitiCapital was a party to.

Citibank asserts that it sent a Notice of Assignment to Burlington on September 30, 2009 to inform Burlington about the assignment, and that Burlington signed the Notice on November 2, 2009 and returned acknowledgment of the assignment to Citibank, then did so again on December 9, 2009. *Id.* In its Facts, Burlington alleges that it never received notice of this assignment, and therefore the assignment was not proper. Burlington's Facts ¶¶ 22–23. However, Burlington rendered its November 2009 rental payment directly to Citibank. Citibank's Facts ¶ 15. Thus, there are clearly facts in dispute regarding whether or not the assignment was properly made, and Burlington is not entitled to summary judgment on these grounds. Furthermore, when resolving all ambiguities in favor of Citibank, the fact that Burlington immediately began to pay Citibank under the terms of the lease suggests that it did in fact receive notice of the assignment. Therefore, Burlington does not establish that it should receive summary judgment on this issue as a matter of law.

Burlington also argues that Citibank lacks standing because it failed to attach copies of all assignments to the complaint and because its assignment documentation was "contradictory and uncertain." Pl.'s Mot. Summ. J. 8. Burlington claims that these are bases for denying standing under Vermont law. *See U.S. Bank Nat'l Ass'n v. Kimball*, 2011 VT 81, ¶ 12, 27 A.3d

15

1087, 1092 (finding bank lacked standing in foreclosure action because it failed to provide evidence of assignment of mortgage note).  However, the precedent Burlington cites on this matter is irrelevant in this instance.  In *Kimball*, the Vermont Supreme Court found that a bank lacked standing in a foreclosure action because "to enforce a *mortgage note*, a plaintiff must show that it was the holder of the note at the time the Complaint was filed," *id.* at 214 (emphasis added), and without the establishment of such ownership, the plaintiff lacks standing, *id.* at 216.  Thus, *Kimball* specifically pertains to mortgage foreclosure actions and is inapplicable in this case.  Furthermore, the requirement of attaching evidence of the assignment to the complaint is derived from Vt. R. Civ. P. 80.1, which sets out the procedures for "foreclosure of mortgages and judgment liens."  Under Rule 80.1, a complaint must include the "original note and proof of ownership thereof, including copies of . . . assignments of the note and mortgage deed."  Vt. R. Civ. P. 80.1(b)(1).  As Citibank is not seeking to foreclose a mortgage or lien, Rule 80.1 does not apply to this action.  Citibank was not required to attach copies of the assignment to the original complaint, and Burlington has not shown that it is entitled to summary judgment on these grounds.

### B. Certificate of Authority

Burlington also argues that Citibank lacks standing to bring this action because neither CitiCapital nor any of its purported assignees obtained a certificate of authority to transact business in Vermont.  Vermont law requires that "foreign corporations" obtain a certificate of authority in order to transact business in the state.  *See* Vt. Stat. Ann. tit. 11A, § 15.01(a).  Under the Vermont Business Corporation Act ("VBCA"), Vt. Stat. Ann. tit. 11A, § 1.01 *et seq.* (2013), "[a] foreign corporation transacting business in this state without a certificate of authority may not maintain a proceeding or raise a counterclaim, crossclaim or affirmative defense in any court in this state until it obtains a certificate of authority." *Id.* § 15.02.  There is no record of CitiCapital or Citibank ever obtaining a certificate of authority to transact business in Vermont pursuant to the VBCA.  Therefore, Burlington argues that Citibank's complaint should be dismissed on these grounds.

This argument is unsustainable with respect to both CitiCapital and Citibank.  It is immaterial that CitiCapital failed to obtain a certificate of authority to transact business in Vermont.  Section 15.01(a) expressly pertains to "foreign corporations," which are defined under the VBCA as "corporation[s] for profit incorporated under a law other than the law of this state." *Id.* § 1.40(9).  CitiCapital was a

17

grantor trust, and therefore did not fall under the definition
of "foreign corporation" under the Vermont law. *See id.* §
1.40(8) (distinguishing between "trust" and "corporation").
Thus, the CitiCapital grantor trust was not covered by § 15.01,
and CitiCapital was not required to obtain a certificate of
authority to conduct business in Vermont.

Citibank, by contrast, *is* a foreign corporation as defined
by the Act.  However, Burlington's argument as to Citibank has
already been foreclosed by the Court.  In its September 13, 2013
Opinion and Order regarding Citibank's motion to dismiss and
Burlington's motion to amend its answer, the Court found that
the National Banking Act, 12 U.S.C. § 1, *et seq.*, gives national
banks the power to "sue and be sued, complain and defend, in any
court of law and equity, as fully as natural persons." *Citibank
II*, 2013 WL 4958645 at *18.  The Court determined that the
National Banking Act preempts Vermont law; therefore, Vermont
may not require a national bank to register as a foreign
corporation before it maintains a lawsuit within the state.  *Id*.
Because Citibank is a national bank covered by the National
Banking Act, the Court dismissed Burlington's affirmative
defense regarding Citibank's failure to obtain a certificate of
authority.  *Id*.  Because Burlington's argument here is identical
to the one the Court dismissed in its previous Order,

Burlington's motion for summary judgment on this basis is now moot.

## II.  Equitable Relief (Counts I & II)

The City also seeks summary judgment specifically with respect to Counts I and II.  These counts ask that the Court exercise its equitable power to order deinstallation and delivery of the Equipment.  Burlington posits that this Court cannot grant such relief as a matter of law because it would be contrary to public policy and result in unreasonable economic waste and hardship.  In addition, Burlington contends that Citibank should be barred from bringing Counts I and II because deinstallation would be an unenforceable penalty, because Citibank has failed to mitigate damages, and because Citibank is barred from seeking deinstallation by the doctrine of equitable estoppel.  While some of these concerns may have some bearing on the ultimate remedy in this case, none of them can support summary judgment at this juncture.

It is axiomatic that trial courts have broad discretion to award equitable relief.  *Huard v. Henry*, 2010 VT 43, ¶ 8, 999 A.2d 1264, 1268 (noting that trial courts have "wide discretion to fashion fair and just equitable relief"); *Richardson v. City of Rutland,* 671 A.2d 1245, 1249 (Vt. 1995) ("Courts have a wide range of discretion to mold equitable decrees to the circumstances of the case before them.")(quotation omitted);

19

*Lariviere v. Larocque*, 168 A. 559, 562 (Vt. 1933) (finding that decision to grant equitable relief is determined by the "sound discretion of the court"); Restatement (Second) of Contracts § 357 cmt. 3 ("The granting of equitable relief has traditionally been regarded as within judicial discretion."). The decision whether to grant equitable relief is determined based on what is reasonable and proper given the circumstances of the individual case before the court. *Lariviere*, 168 A. at 562.

### A. Public Policy

Burlington's primary argument is that Counts I and II should be dismissed because a deinstallation order would violate public policy. The Vermont Supreme Court has declined to enforce some promises based on public policy grounds. *See Lang McLaughry Spera Real Estate, LLC v. Hinsdale*, 2011 VT 29, ¶¶ 22-27, 35 A.3d 100, 108-109 (refusing to enforce contract on public policy grounds). Thus, in certain circumstances, even if a contract is otherwise enforceable, courts should not enforce a promise when the enforcement would adversely affect the public interest.

Burlington argues that deinstallation would violate public policy because it cannot be accomplished without expenditure of taxpayer funds, which would violate the City Charter and the Certificate of Public Good issued by the Public Service Board. The City Charter requires that the PSB, in considering any

application for a CPG, ensures that losses and costs associated
with telecommunications networks are not borne by taxpayers.
*See* Vt. Stat. Ann. tit. 24 App. § 3-438(c)(1).  The Public
Service Board satisfied the statutory requirements under § 3-
438(c)(1) when it issued its original CPG to BT in 2005.  The
CPG provided, "in no event shall any losses or costs, in the
event the enterprise is abandoned or curtailed, incurred by BT
be borne by the City of Burlington's taxpayers."  CPG, ¶ 56.
Because deinstallation would require costs to be "borne by the
City of Burlington's taxpayers," the City argues that equitable
relief would be a violation of the public policy embodied by the
CPG and the City Charter.  Def.'s Mot. Summ. J. 21.

Burlington has not demonstrated that public policy should
foreclose equitable relief at the summary judgment stage.  There
are numerous relevant facts still in dispute with regard to this
issue.  For example, it is disputed whether the MLA is subject
to the conditions of the CPG, because, according to Citibank,
"more than $22 million of the funds by Citibank were not subject
to any restriction or conditions by the PSB or otherwise."
Pl.'s Obj. to Def.'s Mot. Summ. J. 18 n.10.  Furthermore,
factual questions remain as to whether or not "illegal" taxpayer
funds would be required to fund deinstallation.  Because the
City terminated the MLA when it learned it had no legal funds
available to pay its lease obligations, the City reasons that if

deinstallation were ordered, Burlington would have no legal funds to pay for the deinstallation.  However, the City has conceded in this Court that it could satisfy a judgment in this matter.  *See* Transcript, Preliminary Injunction Hearing, March 16, 2012, ECF No. 49;[5] *see also* Burlington's Opposition to Citibank's Motion to Appoint a Receiver over Burlington Telecom, 7, ECF No. 124 ("There is no question that Burlington is financially stable enough to satisfy any potential judgment in this matter.").  Because significant facts remain in dispute, Burlington cannot make the case that the equitable remedy of deinstallation would violate public policy as a matter of law.

_____

[5] At the Preliminary Injunction Hearing, the following exchange took place:

> MR. BURAK: But the defendant in this proceeding is the City of Burlington, and there is no suggestion in this proceeding that the City of Burlington could not satisfy a judgment against it.

> THE COURT: Well, I thought that there's a whole issue as to whether in fact the City of Burlington can be the source of any kind of debts or obligations of Burlington Telecom.

> MR. BURAK: I do believe that a judgment by this Court against the City of Burlington would not be considered in that regard.  I think this – that – a judgment by this Court against the City of Burlington would take precedence.

> . . .

> MR. BURAK: Certainly, Your Honor, if they sued the Burlington Telecom in and of itself, but if your Honor issues a judgment, or if the jury ultimately determines a judgment is liable against the City, I don't see that the Public Service Board condition would take precedent or that the City of Burlington would have much choice.

Preliminary Injunction Hearing, March 16, 2012, 99:17–100:3; 100:14–20.

Furthermore, it is too early in this proceeding for the Court to grant summary judgment based on Burlington's public policy argument.  The Court has not yet determined whether Citibank is entitled to judgment in this case; therefore, it would be premature to assess the public policy implications of the remedies they seek at this stage.  This assessment would also turn on additional issues that have yet to be decided.  To determine whether equitable relief should be denied on public policy grounds, the Vermont Supreme Court has weighed

> the strength of the policy, the likelihood that a refusal to enforce will further that policy, the seriousness of any misconduct involved, and the directness of the connection between that misconduct and the term of the contract to be enforced . . . against the interests in favor of enforcement of the promise—the parties' justified expectations, any forfeiture that would result, and any public interest in enforcement.

*Jipac, N.V. v. Silas*, 800 A.2d 1092, 1095-96 (Vt. 2002); *see also Lang*, 2011 VT ¶ 22, 35 A.3d at 108.  This weighing test would implicate several issues that are raised by the other Counts in Citibank's Complaint, such as whether there was fraudulent inducement, negligent misrepresentation, or a failure to act in good faith.  Compl. 21-29.  As a result, Burlington cannot establish that Counts I and II should be dismissed at the summary judgment stage on public policy grounds.

### B. Economic Waste

Burlington's second argument against equitable relief is that it would result in unreasonable economic waste.  The City argues that because Burlington has invested approximately $17 million into Burlington Telecom, including purchases of new equipment and maintenance of infrastructure and ongoing operations, any remedy to Citibank should allow BT to operate so that this investment is not wasted—thereby foreclosing any deinstallation and delivery remedy.  Def.'s Mot. Summ. J. 17–18. The City cites Vermont law stating that relief should not cause "unreasonable economic waste." *Retrovest Assocs. Inc. v. Bryant*, 573 A.2d 281, 203 (Vt. 1990).  In *Retrovest*, the Vermont Supreme Court found "the measure of damages when a contractor breaches a construction contract [to be] 'the reasonable cost of reconstruction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste.'" *Id.* at 203 (quoting *VanVelsor v. Dzewaltowski*, 385 A.2d 1102, 1104 (Vt. 1978)); *see also Corbin on Contracts*, § 1089, 485–87 (1964) (suggesting that an injured party may get judgment measured by the reasonable cost of reconstruction "if it does not involve unreasonable economic waste").  However, both *Retrovest* and Corbin are referring specifically to *construction* contracts.  The MLA is not a construction contract; therefore the language Burlington cites is not controlling in this matter.  Furthermore, while economic waste is one factor

24

the Court might consider when deciding whether to grant
equitable relief, it is too early in the proceedings to reach
this inquiry.  As a result, Burlington cannot demonstrate that
the economic waste doctrine forecloses equitable relief at this
stage.

### C. Unreasonable Hardship

Burlington's more persuasive argument is that
deinstallation would result in unreasonable *hardship* to the
City.  Courts may refuse to grant specific performance or an
injunction where "such relief would be unfair because . . . the
relief would cause unreasonable hardship or loss to the party in
breach or to third persons."  Restatement (Second) of Contracts,
§ 364 (1981).  Courts in other jurisdictions have found that
specific performance may be refused where it would cause
unreasonable hardship to a party (even the breaching party) in
contrast to the value of the performance to the plaintiff.  *See,
e.g.*, *Concert Radio, Inc. v. GAF Corp.*, 108 A.D.2d 273, 278
(N.Y. 1988) (citing *Williston on Contracts*, § 1425, 832-33 (3rd
Ed. 1968)).  Burlington argues that specific performance would
"strand" Burlington's investment while benefiting no one, "least
of all Citibank."  Def.'s Mot. Summ. J. 23.  The City also
argues that deinstallation would cause harm to the city itself
and all of Burlington Telecom's customers.  *Id.*  Like
Burlington's public policy argument, this determination is fact-

specific and cannot be conclusively ascertained when so many facts remain in dispute.  Furthermore, it would be premature to consider whether a given remedy would cause unreasonable hardship when it has not yet been decided whether Citibank is even entitled to judgment in this action.  Thus, Burlington cannot establish that unreasonable hardship mandates dismissal of Counts I and II at the summary judgment stage.

### D. *Unenforceable Penalty*

Burlington's fourth argument is that Counts I and II should be dismissed because deinstallation and delivery would constitute an "unenforceable penalty" under Vermont law.  In Vermont, damages provisions in contracts "must be intended to compensate the nonbreaching party and not as a penalty for breach or as an incentive to perform." *Glassford v. BrickKicker*, 2011 VT 118, ¶ 24, 35 A.3d 1044, 1052.  As a result, the Vermont Supreme Court has refused to enforce contract provisions that are penalties in nature. *See Highgate Assoc., Ltd. V. Merryfield*, 597 A.2d 1280, 1282–84 (Vt. 1991)(invalidating liquidated damages provision found to be an unlawful penalty); *New England Educ. Training Serv. Inc. v. Silverstreet Partnership*, 595 A.2d 1341, 1346 (Vt. 1991)(same). Burlington argues that deinstallation would be a penalty for the City's breach, rather than compensation.  This argument is misleading.  The case law that Burlington cites on this point

all refers to *liquidated damages* provisions in contracts.   The

provisions at issue here (under Paragraphs 7 and 11 of the MLA)

are plainly not liquidated damages provisions.   Paragraphs 7 and

11 do not address what happens in the event of Burlington's

breach; they are instructions for Burlington in the event that

it chooses to stop leasing Citibank's Equipment.   Thus, the

deinstallation provisions do not punish Burlington for breaching

the contract; rather, they dictate what is to happen to

Citibank's property in the event that Burlington lawfully

terminates the lease.   As a result, the liquidated damages case

law that the City cites in support of its position is

inapplicable and does not support summary judgment for

Burlington as to Counts I and II.

### E. Mitigation

Burlington's fifth argument in favor of dismissing Counts I

and II is that Citibank should not be able to seek equitable

relief because it failed to mitigate its damages when it

rejected several proposals that would have delivered equipment

with value equal to or greater than the value of the Equipment.

In Vermont, the nonbreaching party in a contract dispute has "a

duty to make reasonable efforts to mitigate damages arising from

the breach." *Estate of Sawyer v. Crowell*, 559 A.2d 687, 692

(Vt. 1989).   "Duty to mitigate has alternately been referred to

as the doctrine of 'avoidable consequences' in recognition of

27

the fact that an injured party should not be able to recover
damages for loss that could have been avoided with reasonable
effort." *O'Brien v. Black*, 452 A.2d 1374, 1376 (Vt. 1994).
Burlington contends that because Citibank rejected alternative
proposals, it should not be able to recover equitable relief.
However, the mitigation requirement does not prohibit Citibank
from seeking equitable relief.  The duty to mitigate limits
*damages* to the amount that the injured party could not have
avoided by reasonable means.  *See* Restatement (Second) of
Contracts § 350 (1981) (stating that "damages are not
recoverable for loss that the injured party could have avoided
without undue risk, burden or humiliation").  Here, Citibank
seeks equitable relief; the duty to mitigate damages does not
disqualify Citibank from seeking an equitable remedy.  Thus,
Citibank's failure to settle with Burlington does not estop it
from seeking equitable relief under Counts I and II.

### F. Equitable Estoppel

Burlington's final theory in support of its summary
judgment motion on Counts I and II is one of equitable estoppel.
The purpose of the equitable estoppel doctrine is to "forbid one
to speak against his own act, representations or commitments to
the injury of one to whom they were directed and who reasonably
relied thereon." *Dutch Hill Inn, Inc. v. Patten*, 303 A.2d 811,
815 (Vt. 1973).  When determining whether to apply the doctrine,

the Court must ask whether "in all the circumstances of the case, conscience and duty of honest dealing should deny one the right to repudiate the consequences of his representations or conduct." *Neverett v. Towne*, 179 A.2d 583, 590 (Vt. 1962).

Burlington's equitable estoppel argument is unclear; however, the City seems to be saying that because Citibank has no *real* interest in the Equipment, it may not now require Burlington to invest in deinstallation.  This theory does not implicate the doctrine of equitable estoppel.  For equitable estoppel to apply there must be four elements: "(1) the party to be estopped must know the facts; (2) the party being estopped must intend that its conduct be relied upon or the party asserting estoppel has a right to believe that the conduct is so intended; (3) the party asserting estoppel must be ignorant of the true facts; and (4) the party asserting estoppel must rely on the conduct of the party to be estopped to its own detriment." *Reed v. Zurn*, 2010 VT 14, ¶ 22, 992 A.2d 1061, 1069. In the instant case, the two parties entered into an agreement that clearly stated what would happen in the event of termination of the lease.  Citibank did not indicate to Burlington, expressly or otherwise, that it would not seek equitable relief.  Burlington was never "ignorant of the true facts" nor did it rely on any false assertions by Citibank.

Thus, the equitable estoppel doctrine does not prevent Citibank from seeking equitable relief.

In conclusion, while the Court's decision whether to grant equitable relief may implicate some of the arguments that Burlington puts forth, for example, public policy and unreasonable hardship considerations, there are still significant facts in dispute that make it impossible for the Court to determine whether equitable relief is appropriate at this stage of the proceedings.  Furthermore, the proper remedy cannot be determined before it has been established whether or not Citibank is entitled to judgment in this matter.  Thus, Burlington cannot establish that equitable relief is foreclosed as a matter of law, and its motion for summary judgment as to Counts I and II is denied.

### III. Primary Jurisdiction

Burlington's third major argument is that the doctrine of primary jurisdiction applies, and that the Court should dismiss Counts I and II of the Complaint and instead refer the question of deinstallation to the Public Service Board.  The doctrine of primary jurisdiction allows courts "[t]o refer a matter extending beyond conventional experiences of judges or falling within the realm of administrative discretion to an administrative agency with more specialized experience, expertise, and insight."  *Nat'l Commc'ns Ass'n, Inc. v. AT&T*

*Co.*, 46 F.3d 220, 222-23 (2d Cir. 1995).  In Vermont, the doctrine of primary jurisdiction "cautions courts against exercising jurisdiction when an alternative tribunal with expertise in the subject matter is available to decide the dispute." *Travelers Indemnity Co. v. Wallis*, 2003 VT 103, ¶ 13, 845 A.2d 316, 321.  Burlington argues that because Burlington Telecom is a public utility, it is clothed with the public interest and this proceeding should be referred to PSB jurisdiction. *See* Defs.' Mot. Summ. J. 31.  Furthermore, it asserts that the PSB has the "experience, resources, and insight" necessary to oversee the complex deinstallation process. *Id.*

Burlington has failed to establish that the Court should defer to the PSB in this case.  In Vermont, primary jurisdiction is determined based on "(1) whether the question to be decided is one of law or is a mixed question of fact and law; (2) whether an alternative tribunal with expertise is available to adjudicate the controversy; and (3) whether the plaintiff is attacking the validity of a statute." *Gallipo v. City of Rutland*, 2005 VT 83, ¶ 44, 82 A.2d 1177, 1193.  Applying this test, there is no reason to invoke the doctrine of primary jurisdiction here.  While there are mixed questions of law and fact before the Court, the issues at stake do not fall within the special expertise of the PSB, and, in fact, are well suited

to resolution by this Court.  The question at issue is not the
mechanics of deinstallation; the question is whether the MLA is
valid and requires deinstallation as a matter of contract law.
As Citibank points out in its Objection to Burlington's Motion,
this case has not reached the question of the *mechanics* of
deinstallation yet because no judicial remedy has been
determined.  Pl.'s Obj. to Def.'s Mot. Summ. J. 28.  Thus,
questions as to BT's viability and financial status (the PSB's
purported areas of expertise) are irrelevant at this point.
This Court is plainly qualified to settle a common law breach of
contract claim, and there is no reason to defer judgment to the
PSB.

Burlington's assertion that primary jurisdiction should
apply because Burlington Telecom is a public utility is
similarly unpersuasive.  The Vermont Supreme Court has held that

> it is the quality of the act and not the official
> classification of the actor that determines [the
> question of primary jurisdiction] . . . where the duty
> is primarily to decide a question of private right. .
> . involving a determination of the facts or the
> construction and application of existing laws, the
> function is judicial, and, constitutionally is to be
> performed by the Courts.

*Trybulski v. Bellows Falls Hydro-Elec. Corp.*, 20 A.2d 117, 120–
21 (Vt. 1941).  Thus, the Vermont Supreme Court in *Trybulski*
found that the Public Service Commission's jurisdiction over
public service corporations did not oblige the court to apply

the primary jurisdiction doctrine to actions of contract against such corporations. *Id.* at 121.  This means that BT's status as a public utility has no effect on this Court's jurisdiction over common law claims against BT.

The City's final argument in support of primary jurisdiction stems from the danger that this Court could reach a conclusion inconsistent with the PSB.  While the Vermont Supreme Court has not applied this factor, it has been considered by the Second Circuit in the federal context. *See Nat'l Communications Ass'n,* 46 F.3d at 221 (considering whether "there exists a substantial danger of inconsistent rulings").  The City raises the PSB's current investigation into violations of BT's CPG that may require the PSB to answer questions regarding deinstallation.  In a state case regarding Burlington Telecom, the Chittenden Superior Court deferred to the PSB when it faced questions substantially similar to those on the PSB's docket due to concerns about inconsistent rulings. *Osier v. Burlington Telecom*, Ruling on Mot. to Dismiss, Chittenden Superior Court, Docket No. S1588-09, May 11, 2010.  However, in that case, the court was addressing claims brought under the CPG itself, which had been issued by the PSB and was directly related to the PSB's jurisdiction over Burlington Telecom.  By contrast, the question before the Court is whether deinstallation is required by the MLA.  While the PSB's case may implicate similar questions of

Vermont law, this alone does not justify transferring this case to the PSB.  Thus, the primary jurisdiction doctrine does not apply as to Counts I and II.

## CONCLUSION

Burlington has not demonstrated that there are no material facts in dispute, nor that it is entitled to judgment as a matter of law.  Therefore, the Court **DENIES** Burlington's Motion for Summary Judgment, ECF No. 116, in full.

Dated at Burlington, in the District of Vermont, this 22nd day of October, 2013.

/s/ William K. Sessions III
William K. Sessions III
Judge, United States District Court