UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

```
                               :
Citibank N.A.,                 :
                               :
                Plaintiff,     :
                               :        Case No. 2:11-cv-214
        v.                     :
                               :
City of Burlington and McNeil, :
Leddy & Sheahan, P.C.,         :
                               :
                Defendants.    :
                               :
```

**OPINION AND ORDER**

     This action arises out of a Master State and Municipal

Lease/Purchase Agreement ("Master Lease Agreement" or "MLA")

between the City of Burlington and Citibank as the purported

assignee of CitiCapital Municipal Finance.  The MLA is a non-

appropriation lease-purchase agreement regarding fiber optic

telecommunications equipment ("the Equipment") that was executed

in 2007.  Burlington declined to appropriate funds to pay its

obligations under the MLA in June 2010.  In response, Citibank

filed a fifteen-count Complaint, ECF No. 1, against Burlington

and McNeil, Leddy & Sheahan ("McNeil Leddy"), the law firm that

served as counsel to the city in the negotiation of the MLA.

There is only one surviving count against McNeil Leddy: Count

XIV claims that McNeil Leddy is liable for negligent

misrepresentation for providing an Opinion Letter to Citibank on

behalf of Burlington giving assurances as to the City's ability to make scheduled lease payments.

There are several motions currently before the Court. McNeil Leddy has filed two motions for summary judgment asking the Court to dismiss Count XIV.  In its Opposition to the motions for summary judgment, Citibank filed supplemental statements of undisputed facts, which McNeil Leddy has moved to strike.  Citibank has also filed a motion for leave to amend its complaint against McNeil Leddy in which it seeks to bring three new claims for gross negligent misrepresentation, fraudulent inducement, and fraudulent nondisclosure, and requests punitive damages.  Finally, McNeil Leddy has filed a motion in limine to exclude the testimony of Citibank's expert witness, Leonard S. Rice, Esq.  For the reasons stated below, the Court hereby **DENIES** McNeil Leddy's motions for summary judgment as to Count XIV, ECF Nos. 232 and 233; **GRANTS** McNeil Leddy's motion to strike, ECF No. 254; **DENIES** Citibank's motion for leave to amend the complaint, ECF No. 238; and **DENIES** McNeil Leddy's motion in limine to exclude expert testimony, ECF No. 231.

**BACKGROUND**

## I. Master Lease Agreement

Burlington voters approved the construction of a city-wide telecommunications network, which eventually became known as Burlington Telecom ("BT"), in 1997.  BT's construction was

2

planned to occur in three phases.  Phase I would establish a non-commercial network to provide telecommunications services to municipal offices and schools, Phase II would extend BT services to private customers already within the reach of the Phase I network, and Phase III would build out the commercial network to every residence and business in the City.  BT was initially funded through two lease agreements with Koch Financial, which provided approximately $22.6 million for the project.

Burlington sought funds to continue Phase III of the build-out plan in 2007.  A Vermont organization, Municipal Leasing Consultants ("MLC") won the bid and assigned its rights and obligations under the future agreement to CitiCapital Municipal Finance ("CMF") to actually provide the funds.  On August 9, 2007, Burlington and MLC executed the Master Lease Agreement. The Master Lease Agreement provided approximately $11.5 million for the purchase of new equipment as part of BT's Phase III build-out as well as an additional $22 million that Burlington used to buy out Koch Financial and re-lease the existing equipment.  The total financing commitment under the MLA was $33.5 million.

Burlington Telecom is subject to numerous state and local laws, including restrictions placed on the City by Vermont legislation, Burlington's City Charter, and Burlington Telecom's Certificate of Public Good ("CPG").  Municipalities are

authorized to enter into municipal lease-purchase agreements by

Vt. Stat. Ann. tit. 24, § 1789(a), which provides:

> A municipality . . . may acquire personal property,
> fixtures, technology and intellectual property by
> means of leases, lease-purchase agreements . . .
> wherein payment and performance on the part of the
> municipality is conditioned expressly upon the annual
> approval by the municipality of an appropriation
> sufficient to pay when next due rents, charges, and
> other payments accruing under such leases and
> agreements.

Vt. Stat. Ann. tit. 24, § 1789(a).  The MLA provided that the

City could decline to appropriate (thereby terminating the Lease

Agreement) for any reason.  MLA ¶ 7, ECF No. 1-3.

Burlington's City Charter authorizes the City to provide

telecommunications services, provided that it obtains regulatory

approval from the Public Service Board ("PSB").[1]  *See* Vt. Stat.

Ann. tit. 24A, § 3-449.  The City must obtain a Certificate of

Public Good ("CPG") from the PSB before selling

telecommunications or cable television services.  Vt. Stat. Ann.

tit. 24A, § 3-431(4).  If the City exercises such authority, the

Public Service Board,

> in considering any application for a certificate of
> public good, shall ensure that any and all losses from
> these businesses, and, in the event these businesses
> are abandoned or curtailed, any and all costs

---

[1] The PSB is a quasi-judicial agency with powers of a court of record
"in the determination and adjudication of all matters over which it is
given jurisdiction."  Vt. Stat. Ann. tit. 30, § 9.  The Public Service
Board is the "franchising authority in the state empowered to grant,
renew and revoke certificates of public good for all cable television
systems and shall have all other authority to regulate cable
television systems."  *Id.* § 502(b).

associated with investment in cable television, fiber optic, and telecommunications network and telecommunications business-related facilities, *are borne by the investors in such business, and in no event are borne by the city's taxpayers, the state of Vermont, or are recovered in rates from electric ratepayers*.

Vt. Stat. Ann. tit. 24A, § 3-438(c)(1) (emphasis added).

Pursuant to the City Charter, Burlington sought and was granted a CPG from the PSB for BT on September 13, 2005. Notably, the CPG included a condition which read:

The City shall make payments on behalf of Phase III only when and to the extent that Phase III has cash reserves, revenues receivable, or other payments receivable that, collectively, equal or exceed the sum of the payments to be made by the City plus the balance of any other current payments owed to the City. BT may participate in the City's pooled cash management system provided, however, that BT shall reimburse the City within two months of the City's expenditure for any expenses incurred or payments made by the City in support of services that BT provides to non-City entities. The City shall obtain Board approval prior to appropriating any funds other than as described above in the support of BT's Phase III activities.

CPG, ¶ 60, ECF No. 14-7.

## II.  **August 17 Opinion Letter**

McNeil Leddy served as legal counsel to the City of Burlington during the negotiation of the MLA.  Because of the legal constraints on City funds introduced above, Citibank requested that Burlington's counsel provide an Opinion Letter regarding the City's ability to pay its obligations under the lease agreement.  Citibank specifically sought these assurances

5

because of the Burlington City Charter provision disallowing the use of taxpayer revenues to cover Burlington Telecom losses. *See* Vt. Stat. Ann. tit. 24A, § 3-438(c)(1).  McNeil Leddy issued the requested Opinion Letter on August 17, 2007.  The Opinion Letter was based on "opinions, documents and matters of law" that McNeil Leddy deemed necessary for review.  August 17 Opinion Letter, ECF No. 238-3.  The Opinion Letter stated in relevant part:

> Lessee has the requisite power and authority to lease the Equipment with an option to purchase and to execute and deliver the Agreement and the Schedule and to perform its obligations under the Agreement and the Schedule.  As required by the City charter and the Telecommunications Authority Act above referenced the City has received a Certificate of Public Good from the Vermont Public Service Board ("PSB") to provide telecommunications services. The order of the PSB is consistent with the City's enabling authority (charter Section 438(c)(1).  There is no prohibition of utilizing general fund revenues of the City for telecommunications activities.  However, there is a specification that losses from telecommunications are not to be borne by the City's taxpayers, the State of Vermont or recovered in rates from electric ratepayers.  The same restriction applies to costs incurred in the event of any abandonment or curtailment of the telecommunications system by the City.  We are advised that approximately 40% of general fund revenues are derived from other sources than through taxation of the City's taxpayers.

*Id.* ¶ 3.  The Opinion Letter does not address Condition 60 of the CPG.

In answers to Interrogatory questions filed December 20, 2012, McNeil Leddy stated that the "opinions, documents, and

matters of law" reviewed in preparation for the Opinion Letter
included the Burlington City Charter, Vermont Telecommunications
Authority legislation, Vermont municipal lease financing
legislation, and the Lease documents; the list did not include
the CPG.  ECF No. 244-1.  McNeil Leddy also affirmatively
indicated that it had not reviewed the CPG in preparing the
Opinion Letter in the following Interrogatory response:

> INTERROGATORY NO. 21
> If You contend that You informed Citibank of the
> requirements of the CPG, and in particular Condition
> 60 of the CPG, before the Agreement was executed,
> please state all facts which support that contention,
> and please identify all documents which support Your
> contention.
>
> RESPONSE:
> We were not asked and therefore we did not review or
> inform Citibank of any particular requirements of the
> CPG before the Agreement was executed.

*Id.*  During the summer of 2013, after the deadline to amend
pleadings had passed,[2] Citibank deposed two McNeil Leddy
attorneys: Joseph E. McNeil, Esq., and William F. Ellis, Esq.
In the course of these depositions, Attorney McNeil admitted
that he had not read the CPG prior to issuing the August 17,
2007, Opinion Letter, nor did he investigate whether Burlington
had the power and authority under the CPG to enter into and
fully perform its obligations under the MLA.  McNeil Dep. 70:23-

---

[2] Although the depositions actually occurred after the deadline to
amend the pleadings, Citibank attempted to schedule depositions with
both attorneys in May 2013 and followed up with McNeil Leddy regarding
scheduling several times.  Mot. Am. 3.  On July 18, 2013, McNeil Leddy
finally scheduled the depositions for late August.

71:5, Aug. 27, 2013.  Attorney Ellis also testified that he had
not discussed Condition 60 of the CPG with anyone until late
2008, well after the MLA had been executed.  Ellis Dep. 20:16-
21:17, Aug. 27, 2013.

McNeil Leddy has stated in a sworn response to
interrogatories that the 40% figure came from John Stewart, then
Burlington's chief accountant, and Jonathon Leopold, then
Burlington's Chief Administrative Officer.  McNeil Leddy's Resp.
Pl.'s First Interrog. 8-9, ECF No. 232-3.  In their depositions,
both Messrs. Stewart and Leopold confirmed the 40% figure.
Stewart Dep. 68:15-16, Aug. 29, 2013 (confirming that 40 percent
of the City's revenues were from sources other than taxes);
Leopold Dep., 100:13-20, 101:2-7, Sept. 18, 2013 (stating that
Mr. Leopold calculated the percentage of nontax revenue in the
general fund for Attorney McNeil and that it was roughly 40
percent).

In response to a request for admission, Citibank admitted
that it had obtained information directly from Burlington that
57% of the City's General Fund revenues for fiscal year 2006
came from taxes with the remainder from other sources (including
licenses and permits, fines, and charges for services).  Pl.'s
Resp. McNeil Leddy's First Req. Admission No. 24.  In a
deposition, Kathleen Maloney, one of the credit officers for
CMF, acknowledged that "the approximately 40 percent" statement

8

in Attorney McNeil's letter was accurate based on her own
calculations.  Maloney Dep. 249:3-13, Oct. 9, 2013.

## III. Nonappropriation and Litigation

In the spring of 2010, Burlington exercised its rights
under the nonappropriation clause of the MLA and stopped making
payments to Citibank based on the determination that all of
Burlington's funds were unavailable for payment on the Master
Lease.  According to the City, the only legally available funds
were BT revenues.  Burlington therefore elected not to
appropriate funds to support its payment obligations for the
fiscal year beginning July 1, 2010.  Citibank then brought suit
against the City and against McNeil Leddy.  The original
complaint included two counts against McNeil Leddy: Count XIV,
which alleged that Citibank suffered injury due to McNeil
Leddy's negligent misrepresentation in its Opinion Letter,
Compl. ¶¶ 204-214; and Count XV, which was dismissed, Mem. Op. &
Order June 7, 2012, ECF No. 54; *Citibank v. City of Burlington*,
No. 2:11-cv-214, 2012 WL 2050730 (D. Vt. June 7, 2012).

The surviving count against McNeil Leddy, Count XIV, is
predicated on the argument that McNeil Leddy "induced Citibank
to enter into the Agreement" through the following "incorrect"
statement in the Opinion Letter: "We are advised that
approximately 40 percent of general fund revenues are derived
from other sources than through taxation of the City's

9

taxpayers" (hereinafter "the 40% Statement").  Compl. ¶¶ 210-11.
In the Complaint, Citibank alleges that this statement was
incorrect when made, that McNeil Leddy should have known of its
incorrectness, and that it was foreseeable that Citibank would
rely on the incorrect statement to its detriment, thereby making
McNeil Leddy liable for negligent misrepresentation.
Furthermore, Citibank alleges that McNeil Leddy failed to use
reasonable care to confirm and accurately communicate the
availability of general fund revenues for the MLA.  Based on
these allegations, Citibank seeks damages for negligent
misrepresentation in the amount of $33,500,000.00.

In October 2013, McNeil Leddy filed two motions for summary
judgment.  In these motions, McNeil Leddy argues that it is
entitled to judgment as a matter of law with respect to Count
XIV on two bases: first, that there is no genuine issue of fact
with regard to whether the above quoted statement was incorrect
when made, and second, that Citibank assumed the risk of
nonappropriation when it entered into the lease agreement that
included a nonappropriation clause.  Shortly after these two
motions for summary judgment were filed (and, indeed, before
filing their responses to the motions), Citibank filed a motion
for leave to file an amended complaint on October 24, 2013.
Citibank's motion was filed over three months after the Court's
scheduling order deadline to amend the pleadings on July 15,

2013.  Citibank's motion to amend seeks to add allegations and counts for gross negligent misrepresentation, fraudulent inducement, and fraudulent nondisclosure, along with punitive damages.  The motion to amend alleges that the information acquired from the deposition testimony of Attorneys McNeil and Ellis in August 2013 gave rise to these new claims, and that this information was not available before the scheduling order deadline for amending the complaint.  The motion for leave to amend was filed two months after these depositions, and Citibank allowed at least seven depositions to proceed without giving McNeil Leddy any notice of its intention to bring the new claims.  McNeil Leddy's Opp'n Mot. Am. 7.

## IV.  Expert Testimony

To support its negligent misrepresentation claim under Count XIV, Citibank has retained Leonard S. Rice, Esq., as a testifying expert witness to assess whether McNeil Leddy's Opinion Letter conformed with the standard of care owed by local counsel in the context of municipal financing.  Attorney Rice has practiced as a municipal finance attorney, with an emphasis on municipal tax-exempt lease financing, for over three decades. In his deposition, he described himself as a "bond lawyer." Rice Dep. 12:1, Aug. 21, 2013.  McNeil Leddy has characterized the Opinion Letter as a "closing opinion" or a "local counsel opinion."  Such local counsel opinions are distinct from "bond

11

opinions," which are similar, but specifically relate to the validity of bonds.

Attorney Rice has not published any articles or papers on the topic of closing opinions.  At his deposition, Attorney Rice testified that he is "a little bit mystified by this concept of a closing opinion [because] those aren't terms [he] use[s] in [his] practice."  *Id.* 20:14-18.  His deposition indicates that he is not familiar with much of the literature on the standard of care applicable to issuers of closing opinions, and he expressly testified that he did not know of any national standards applicable to the issuance of closing opinions in the municipal leasing industry.  *Id.* 186:12-23.  However, his Report explains the differences between the municipal bond business and the tax-exempt leasing industry and indicates that he has significant experience in both fields.

**DISCUSSION**

**I.   Motions For Summary Judgment**

McNeil Leddy has filed two motions for summary judgment dismissing Count XIV.  First, McNeil Leddy asserts that there is no genuine issue requiring a trial on whether the challenged statement in the Opinion Letter was false when made.  In the alternative, McNeil Leddy argues that it owed no duty to Citibank because Citibank assumed the risk of nonappropriation. Summary judgment is appropriate if the moving party can show

"that there is no genuine issue as to material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).  A fact is material when it affects the outcome of the suit under the governing law, and a dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

### A. *Motion to Strike Statement of Undisputed Material Facts*

In response to McNeil Leddy's two motions for summary judgment, Citibank included both a statement of disputed material facts and an additional statement of "further undisputed material facts."  Pl's Statement of Disputed Material Facts, ECF No. 252-2.  McNeil Leddy has moved to strike the statement of undisputed material facts as unauthorized by the Federal Rules of Civil Procedure and by the District of Vermont's Local Rules.  This Court has found that the Federal Rules and the Local Rules do not allow the non-movant party to present undisputed facts. *Schroeder v. Makita Corp.*, 2:02-cv-299, 2006 WL 335680 at *4 (D. Vt. Feb. 13, 2006)(Sessions, C.J.) (explaining that the Local Rules only afford the non-moving party "the opportunity to bring relevant *disputed* factual matters to the Court's attention" (emphasis added)).  Citibank's statement of undisputed material facts is therefore not authorized by the Local Rules.

13

Citibank argues that *Schroeder* is not dispositive because subsequent decisions citing the case have considered additional facts where "it is clear from the parties' briefing that those facts are both material and undisputed." *Boule v. Pike Industries, Inc.*, No. 5:12-cv-7, 2013 WL 711937 at *2 (D. Vt. Feb. 27, 2013); *see also Rotman v. Progressive Ins. Co.*, ___ F. Supp. 2d ___, No. 5:12-cv-67, 2013 WL 3293531 (D. Vt. June 28, 2013)(same); *Post v. Killington Ltd.*, No. 5:07-cv-252, 2010 WL 3323659 at *1 n.1 (D. Vt. May 17, 2010) (striking unauthorized additional facts, but considering facts that were both integral and undisputed). However, in both *Boule* and *Rotman*, neither party moved to strike the unauthorized facts. By contrast, McNeil Leddy has moved to strike the statement of additional undisputed material facts and therefore it is not "clear from the briefings" that Citibank's undisputed facts are in fact undisputed. The Court strikes the additional facts, and will not consider them when deciding on the motions for summary judgment.

### B. First Motion for Summary Judgment

McNeil Leddy's first motion for summary judgment contends that Citibank cannot prove its allegation that McNeil Leddy provided false information in its Opinion Letter, which is a required element of a claim for negligent misrepresentation.

Vermont[3] has adopted the Restatement definition of negligent misrepresentation.  *See Limoge v. People's Trust Co.,* 719 A.2d 888, 890 (1998).  The Restatement provides that a claim of negligent misrepresentation may be made "against one who, in the course of his business, profession or employment supplies false information for the guidance of others in their business transactions[,] . . . where there is justifiable reliance on the information provided . . ., and where that reliance results in pecuniary loss."  *McGee v. Vt. Fed. Bank, FSB,* 726 A.2d 42, 44 (Vt. 1999) (citing *Limoge,* 719 A.2d at 890; Restatement (Second) of Torts § 552(1) (1977)).  Under this standard, McNeil Leddy will only be liable for negligent misrepresentation if it "supplied false information" to Citibank in drafting the Opinion Letter.  *See Howard Opera House Assocs. v. Urban Outfitters, Inc.*, 166 F. Supp. 2d 917, 927 (D. Vt. 2001), *aff'd* 322 F.3d 125 (2d Cir. 2003).

In the Complaint, Citibank alleges that the 40% Statement—which declares, "We are advised that approximately 40% of general fund revenues are derived from other sources than through taxation of the City's taxpayers"—was incorrect when made, and that Citibank relied on the 40% Statement to its detriment.  McNeil Leddy argues that Citibank cannot demonstrate

---

[3] The Court has federal jurisdiction as a result of diversity and therefore must apply the substantive law of the state of Vermont. *See Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938).

that this statement is inaccurate because subsequent discovery
has confirmed the accuracy of the 40% figure.  Citibank deposed
Messrs. Stewart and Leopold, both of whom testified that they
calculated the percentage of non-taxpayer revenue in the general
fund for Attorney McNeil and that it amounted to roughly 40%.
Citibank also independently confirmed that 54% of the City's
general fund revenues came from taxes, both by asking the City
directly and through an independent assessment.  As a result,
McNeil Leddy argues that Citibank has not shown that there is
any factual question as to whether the 40% Statement was false
at the time it was made.  Because "false information" is a
necessary element of a negligent misrepresentation claim, McNeil
Leddy contends that Count XIV should be dismissed at the summary
judgment stage.

Even if the 40% figure was accurate when made, this would
not provide sufficient grounds to grant summary judgment here.
McNeil Leddy's argument is premised on an unreasonably limited
construction of Count XIV.  As Citibank persuasively argues in
its Opposition, McNeil Leddy's reading of Count XIV is a
mischaracterization of Citibank's negligent misrepresentation
claim that "recast[s it] as a mere allegation that the last
sentence of Paragraph 3 of the Opinion Letter was technically
false as a matter of fact."  Pl.'s Opp'n 2, ECF No. 252-1.  The
complaint should not be read so literally; instead, the Court

may read the pleadings in light of all the facts alleged.  *See*
Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do
justice."); *Arar v. Ashcroft*, 585 F.3d 559, 595 (2d Cir. 2009)
(finding that assessment of complaint must "take into account
the entire arc of factual allegations that it contains");
*Shapiro v. Cantor*, 123 F.3d 717, 721 (2d Cir. 1997) (construing
complaint by "considering the allegations in context").  While
Citibank's complaint only expressly challenges the truthfulness
of the 40% Statement, the underlying gravamen of Count XIV is
that the 40% Statement, when read in the context of the Opinion
Letter as a whole, misrepresents that the general fund is
*available* to pay the City's lease obligations.  This
construction of Count XIV is based on McNeil Leddy's
representation that the City Charter only restricts the use of
taxpayer-derived funds, and that the general fund includes funds
that are not taxpayer derived and therefore are unrestricted.[4]

---

[4] This is evidenced by the following exchange in the deposition of Toni
Stegeman, Citibank's transactional counsel:

> **Q: Then that sentence is followed by, We are advised that
> approximately 40 percent of the general fund revenues are
> derived from other sources than through taxation of City
> taxpayers; correct?**
> A: Right.
> **Q: Had CitiCapital asked that that sentence be put in the
> opinion letter?**
> A: When we were on the conference call there was concern
> about this restriction of taxpayer revenues and [Attorney
> McNeil] explained that it is only taxes that restricts and
> that the general fund includes much more than just tax
> revenue. And so this statement was made about the 40
> percent.

The Court finds this to be a credible reading of Count XIV, as "the sole reason [McNeil Leddy] offered the 40% representation was to document in the Opinion Letter to Citibank's satisfaction Burlington's representation that it could access its general fund . . . to make payments under the MLA."  Pl.'s Opp'n 8.

This is also how the Court characterized Count XIV in its Order on the motion to dismiss in June 2012, explaining: "Citibank required assurances that Burlington could access its legally available, non-taxpayer sources for payment on the Master Lease; those assurances were provided in McNeil's Opinion Letter." *Citibank*, 2012 WL 2050730, at *5.  Thus, the Court reads Count XIV to claim that McNeil Leddy provided false information by indicating that Burlington could access the general fund to pay its obligations under the MLA.  Because the Court declines to adopt McNeil Leddy's narrow construction of Count XIV, a factual question remains as to whether the Opinion Letter supplies the "false information" necessary to sustain a negligent misrepresentation claim.

An open question also remains as to whether Citibank can rely on an Opinion Letter in its negligent misrepresentation claim.  Vermont negligent misrepresentation claims apply to "'information given as to the *existence of facts*.'"  *Respucci v.*

---

Stegeman Dep., Aug. 23, 2013, 111:1-13.

*Lake Champagne Campground, Inc.*, 251 F. Supp. 2d 1235, 1239 (D.
Vt. 2002) (quoting Restatement § 552 cmt. b (emphasis added)).
Statements of opinion generally cannot form the basis of actions
for negligent misrepresentation.  *Id.*  In *Respucci*, the Court
found statements nonactionable because they were "subjective
evaluations of [] quality and value."  *Id.*  However, this does
not preclude negligent misrepresentation claims based on legal
opinions.  According to the Vermont Supreme Court:

> An important distinction must be made between
> representations of legal *opinions* and representations
> of *fact* relating to the law as it exists. While it is
> fruitless to attempt to conform every decision to a
> single consistent principle, in general, cases have
> distinguished between misrepresentations involving
> opinions and those involving facts. The first involves
> the legal meaning and effect of a statute, court
> ruling, document, instrument or other source of law,
> while the latter involves statements that imply the
> existence of accurate and readily ascertainable facts
> that either concern the law or have legal
> significance, but which are not part of the law
> themselves.

*Winton v. Johnson & Dix Fuel Corp.*, 515 A.2d 371, 373-74 (Vt.
1986).  *Winton* further held that "[w]here a representation as to
a matter of law is essentially a matter of fact, the recipient
may rely on it in a business transaction to the same extent as
the recipient would other facts."  *Id.* at 374.

Under Vermont law, juries are given the task of determining
whether a statement is one of fact or opinion, unless the
statement is "'so plainly of the one class or the other [that

19

it] can be disposed of by the court without the aid of the jury.'" *Respucci*, 251 F. Supp. 2d at 1239 (quoting *Batchelder v. Birchard Motors, Inc.*, 144 A.2d 298, 301 (Vt. 1958)).  In this case, the Opinion Letter contains statements not "plainly of one class or the other" that require the aid of a jury.  For example, the Opinion Letter states that there is no prohibition on using general fund revenues of the City for telecommunications activities, which arguably constitutes a "representation of fact relating to the law as it exists" as described in *Winton*.  The question of whether the Opinion Letter contained the "false information" necessary to sustain a negligent misrepresentation claim implicates triable issues of material fact, and Count XIV cannot be dismissed at the summary judgment stage on these grounds.

### C. Second Motion for Summary Judgment

McNeil Leddy's second motion for summary judgment contends that Citibank is foreclosed from bringing a negligent misrepresentation claim under a primary assumption of risk theory.  The Vermont Supreme Court has found that where the primary assumption of risk doctrine is implicated, the defendant owes no duty to the plaintiff with respect to the risk in question.  *See Estate of Frant v. Haystack Group, Inc.*, 641 A.2d 765, 769 (Vt. 1994).  McNeil Leddy argues that because the MLA contained a non-appropriation clause, Citibank assumed the risk

that Burlington would cease to appropriate funds to make lease
payments, and therefore McNeil Leddy owed no duty to Citibank
with respect to the risk of nonappropriation.  McNeil Leddy's
primary assumption of risk position fails because regardless of
whether Citibank assumed the risk of nonappropriation when it
executed the MLA with Burlington, Citibank's allegation against
McNeil Leddy in this case is that it *would not have executed the
MLA in the first place absent the assurances provided by the
Opinion Letter*.  Because Citibank would not have assumed the
risk of nonappropriation without the Opinion Letter, the primary
assumption of risk doctrine does not relieve McNeil Leddy of its
duty to Citibank.  It has yet to be determined whether
Citibank's reliance on the Opinion Letter was actual or
reasonable; however, this is a question for a finder of fact.
Therefore, McNeil Leddy's second motion for summary judgment is
also denied.

## II.  Motion for Leave To Amend

Citibank has also moved to amend its complaint to add three
additional claims against McNeil Leddy.  The Federal Rules of
Civil Procedure dictate that "a party may amend its pleadings
only with the opposing party's written consent or the court's
leave."  Fed. R. Civ. P. 15(a)(2).  In general, courts should
"freely give leave [to amend the complaint] when justice so
requires."  Fed. R. Civ. P. 15(a)(2).  However, this freedom

21

"must be balanced against the requirement under Rule 16(b) that the Court's scheduling order shall not be modified except upon a showing of good cause." *Holmes v. Grubman,* 568 F.3d 329, 334–35 (2d Cir. 2009) (internal quotations omitted).  Courts should also consider whether prejudice to the opposing party will result from the proposed amendment.  *See State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981).  The good cause and prejudice issues will be addressed individually below.

### A. Good Cause

The Court will only grant Citibank leave to amend its complaint after the scheduling order deadline if Citibank can demonstrate good cause.  "Whether good cause exists turns on the 'diligence of the moving party.'"  *Holmes*, 568 F.3d at 335 (quoting *Grochowski,* 318 F.3d at 86).  Therefore, the burden is on Citibank to show that its motion to amend is predicated on good cause and not a result of a lack of diligence.  *Id*. Citibank argues that the Court should grant leave to amend because its new claims are based on deposition testimony taken from Attorney McNeil and Attorney Ellis in late August 2013, after the deadline for amendment had passed.  Citibank contends that it can demonstrate good cause because it was diligent in attempting to schedule these depositions in advance of the pleading deadline.  Citibank's memorandum and supporting documentation demonstrate that it was in fact diligent in

22

attempting to schedule these depositions.  However, this
diligence is not sufficient to establish the good cause required
to allow such a late amendment to the complaint because the
information derived from the depositions was not actually
necessary to the new claims.

Citibank had information sufficient to amend its complaint
as early as December 2012.  In its motion, Citibank argues that
it had "no good faith reason" to believe that McNeil Leddy had
engaged in conduct amounting to fraud and gross negligence until
the depositions and asserts that the depositions demonstrated
that McNeil Leddy had not performed adequate due diligence with
regard to the conditions of the CPG when it prepared the Opinion
Letter.  Mot. Amend. 10.  However, McNeil Leddy's answers to the
Interrogatories from December 2012 put Citibank on notice that
the firm had not reviewed the CPG in its preparation of the
Opinion Letter.  In these responses, McNeil Leddy listed the
documents it had reviewed in preparing the Opinion Letter, and
the CPG and the PSB order were not among them.  McNeil Leddy
also provided the following response to an Interrogatory:

> INTERROGATORY NO. 21
> If You contend that You informed Citibank of the
> requirements of the CPG, and in particular Condition
> 60 of the CPG, before the Agreement was executed,
> please state all facts which support that contention,
> and please identify all documents which support Your
> contention.
>
> RESPONSE:

> We were not asked and therefore we did not review or
> inform Citibank of any particular requirements of the
> CPG before the Agreement was executed.

Def. McNeil Leddy's Resp. Pl.'s First Interrogs., ECF No. 244-1.

Thus, as of December 2012, Citibank already knew that Condition

60 was a relevant factor with respect to whether Burlington had

the ability to satisfy the obligations of the MLA, and it knew

that McNeil Leddy had not reviewed the CPG in giving its legal

opinion to Burlington and Citibank.

Citibank states that it did not know Attorney McNeil had

*never* read the CPG until the August depositions and that this

discovery provided the basis for its motion to amend.  The crux

of the motion to amend, however, rests on Attorney McNeil's

alleged failure to "investigate or [perform] due diligence" in

advance of issuing the Opinion Letter.  Mot. Amend. 10.  The

interrogatory responses, which indicate that McNeil Leddy did

not review the CPG in preparing the Opinion Letter, provide

equal support for the proposition that there was insufficient

due diligence.  Thus, if Citibank had been diligent, it would

have amended its Complaint to reflect McNeil Leddy's failure to

review the CPG well before the July deadline.

In its Reply, Citibank further argues that it did not have

the requisite information to add claims for fraudulent

misrepresentation and nondisclosure before the August

depositions, as fraud claims are subject to a heightened

pleading standard.  Even assuming this to be true, the Court finds it significant to the good cause determination that Citibank did not amend its existing claims or seek to add gross negligent misrepresentation claims to expressly implicate McNeil Leddy's failure to review the CPG, even though it learned about this in December 2012.  As a result, Citibank's primary good cause argument—that it did not have the information underlying its proposed amendments until the August depositions—is unpersuasive.  Citibank has therefore not demonstrated the good cause necessary for the Court to allow it to amend its complaint so long after the discovery order deadline.

Finally, even if Citibank *did* discover new information through the depositions that would justify such a late amendment, it was not diligent in filing this motion.  The allegedly new information was obtained through depositions performed in late August.  This motion was not filed until October 24, 2013, two months after the depositions and after McNeil Leddy had filed for summary judgment as to Count XIV.  Citibank also allowed seven depositions to proceed in September and October without notifying McNeil Leddy of its intention to add new claims.  These delays further detract from Citibank's attempts to demonstrate the diligence necessary to support a finding of good cause.

### B. Prejudice

Allowing Citibank to amend its complaint at this stage of the proceedings would also result in significant prejudice to McNeil Leddy.  The Second Circuit has cited prejudice to the opposing party resulting from proposed amendment as "perhaps [the] most important" reason for denial of leave to amend.  *AEP Energy Serv. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 724 (2d Cir. 2010) (quoting *State Teachers Ret. Bd.,* 654 F.2d at 856).  The Second Circuit has found that *even if* there was good cause to act so late, good cause is not necessarily sufficient to discount "the significant prejudice resulting from permitting" such a late motion.  *Id.* at 727.  Amendment may be prejudicial when it would "'require the opponent to expend significant additional resources to conduct discovery and prepare for trial' or 'significantly delay the resolution of the dispute.'"  *Id.* at 724 (quoting *State Teachers Ret. Bd.,* 654 F.2d at 856).

Citibank knew in December 2012 that McNeil Leddy had not reviewed the CPG in preparing the Opinion Letter, and still did not move to amend its Complaint.  Instead, it waited until three months after the discovery order deadline to move to amend, after McNeil Leddy had filed its motions for summary judgment, and only months before trial.  This late filing, coupled with the substantial amount of additional preparation it would require of McNeil Leddy, constitutes sufficient prejudice for

the Court to deny the motion. *See Zahra v. Town of Southold*, 47 F.3d 674, 686 (2d Cir. 1995) ("It was entirely reasonable for the district court to deny a request to amend a complaint that was filed two and one-half years after the commencement of the action, and three months prior to trial."); *AEP Energy Servs. Gas Holding Co.*, 626 F.3d at 726 (affirming denial of motion to amend where plaintiffs filed motion three years after complaint and only after defendants moved for summary judgment).

Citibank argues that allowing for late amendment here would not be prejudicial because there is no difference between negligent misrepresentation and "gross" negligent misrepresentation other than the level of neglect and that its fraudulent inducement and nondisclosure claims only differ with respect to whether McNeil Leddy's culpability has risen to the level of fraudulent intent. Mot. Am. 11. Contrary to Citibank's assertions, these differences are substantial and would require McNeil Leddy to perform significant additional preparation and discovery. For example, McNeil Leddy states that much of its discovery has been devoted to investigating Citibank's due diligence in support of a contributory negligence defense, which, according to Citibank, would not bar the new fraud claims. The new counts would therefore require extended discovery beyond the current deadline to "evaluate the new claims, reconsider defenses, answer the amended complaint,

27

conduct additional discovery, develop new expert testimony and other evidence, and file appropriate dispositive motions addressing new theories." McNeil Leddy's Opp'n Mot. Am. 10-11. These significant resource expenditures and delays would cause prejudice to McNeil Leddy.

Finally, because the Court also denies McNeil Leddy's two motions for summary judgment and chooses to adopt Citibank's more expansive reading of Count XIV, Citibank will not be unduly injured by the Court's refusal to allow for amendment in this case. Citibank's negligent misrepresentation claim will extend to McNeil Leddy's failure to review the CPG; thus, Citibank will still be able to make its arguments regarding McNeil Leddy's alleged lack of due diligence. Because Citibank has not established sufficient good cause, and the amendment would be unfairly prejudicial to McNeil Leddy, the Court hereby denies Citibank's motion for leave to amend the complaint.

## III. Motion in Limine to Exclude Expert Testimony

To support its negligent misrepresentation claim, Citibank seeks to introduce the testimony of Leonard S. Rice as an expert on the standard of care owed by issuers of local counsel opinions in the context of public finance law and municipal tax-exempt non-appropriation lease transactions. Citibank maintains that Attorney Rice is a qualified expert based on his substantial career experience in public finance law and with

such lease agreements.  McNeil Leddy has filed a motion in limine to exclude Attorney Rice's testimony, arguing that Rice does not possess the requisite knowledge and experience to be qualified as an expert on the standard of care owed by issuers of closing opinions and that his testimony is too unreliable and speculative to be admissible.

The Federal Rules of Evidence dictate that a witness "qualified as an expert by knowledge, skill, experience, training, or education" may testify if the testimony will help the factfinder determine a fact in issue; is based on sufficient facts or data; is a product of reliable principles and methods; and the expert has "reliably applied" these principles and methods to the facts in the case.  Fed. R. Evid. 702.  The court must make the preliminary determination as to whether a witness is so qualified, Fed R. Evid. 104(a), and whether the testimony is relevant and reliable.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

McNeil Leddy first argues that Attorney Rice's testimony should be excluded because he does not have the required "knowledge, skill, experience, training, or education" to support his qualification as an expert witness.  While McNeil Leddy acknowledges that Attorney Rice is well versed in bond issues, it argues that Attorney Rice is not sufficiently knowledgeable to qualify as an expert on third party closing

opinions.  As a result, McNeil Leddy argues that Attorney Rice's testimony should be excluded because expert witnesses are not permitted to offer an opinion outside their area of expertise. *See Lexington Ins. Co. v. Rounds*, 349 F. Supp. 2d 861, 870 (D. Vt. 2004) ("An expert may not offer an opinion outside of his or her area of expertise."); *Plourde v. Gladstone*, 190 F. Supp. 2d 708, 719 (D. Vt. 2002) ("An expert may not offer an opinion on a different field or discipline.").  McNeil Leddy therefore argues that Attorney Rice's expertise in bond opinions should not extend to the Opinion Letter at issue in this case.

This requirement does not disqualify Rice's expert testimony because his evaluation of the Opinion Letter is sufficiently related to his area of expertise.  In the above-cited cases, the Court did not allow expert testimony where the opinion and the expertise were distinctly unrelated.  *See Rounds*, 349 F. Supp. 2d at 870 (not allowing an engineer to testify as an expert on lay person behavior); *Plourde*, 190 F. Supp. 2d at 719 (prohibiting an expert with a Ph.D. in toxicology from providing a medical opinion).  In stark contrast to these examples, Rice's field or discipline is sufficiently connected to his proffered testimony for it to fall within his area of expertise.  While bond opinions and third-party closing

opinions are not identical,[5] Attorney Rice's qualifications indicate that he has significant experience in the tax-exempt leasing field.  As McNeil Leddy's own expert witness, Donald W. Glazer, has written, "what is reasonable in the case of closing opinions, unless otherwise agreed, is determined by the customary practice of lawyers who regularly give and who regularly represent recipients of opinions of the kind involved."[6]  Attorney Rice regularly represents recipients of such opinions, which qualifies him to render a judgment regarding local counsel opinions in the context of municipal tax-exempt lease transactions.  His knowledge and experience is therefore sufficient to support his expert testimony regarding the Opinion Letter.

McNeil Leddy also argues that Attorney Rice's testimony is speculative and has "no basis in any reliable methodology." Mot. 11.  The Second Circuit has required that "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached," exclusion of unreliable opinion testimony is appropriate.  *Amorgianos v.*

---

[5] A bond opinion is distinguishable from a closing opinion in several respects.  For example, bond opinions are generally more streamlined and unqualified, while third-party closing opinions are less certain and contain more limitations and assumptions.  National Association of Bond Lawyers, *The Function and Professional Responsibilities of Bond Counsel* 13-14 (3d ed. 2011).

[6] Glazer & Fitzgibbons on Legal Opinions, Drafting, Interpreting and Supporting Closing Opinions in Business Transactions, § 1.6.1, p. 30 (3d Ed. Aspen Publishers 2008).

*Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).
However, courts should only exclude the expert testimony "if the
flaw [in method] is large enough that the expert lacks 'good
grounds' for his or her conclusions." *In re Paoli*, 35 F.3d 717,
746 (3d Cir. 1994).  This is because "our adversary system
provides the necessary tools for challenging reliable, albeit
debatable, expert testimony." *Amorgianos*, 303 F.3d at 267; *see
also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination,
presentation of contrary evidence, and careful instruction on
the burden of proof are the traditional and appropriate means of
attacking shaky but admissible evidence.").

In this case, Attorney Rice's testimony relies on his
significant professional experience in the municipal tax-exempt
leasing field, and his analysis of the Opinion Letter is
grounded in that experience.  This is sufficient to meet the
standard for reliability. *See Pension Comm. of Univ. of
Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d
448, 460-61 (S.D.N.Y. 2010) (finding that professional
experience provided a reliable basis for expert testimony).
While Attorney Rice might not be familiar with every treatise on
the topic of third-party closing opinions, these are issues
"properly explored on cross-examination" and speak to "[Rice's]
testimony's weight and credibility—not its admissibility."
*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995).

Because the Court finds Attorney Rice's testimony to be adequately supported by knowledge and experience, and sufficiently reliable and nonspeculative, the Court denies McNeil Leddy's motion in limine to exclude the expert testimony.[7]

## CONCLUSION

For the reasons stated above, the Court DENIES McNeil Leddy's first and second motions for summary judgment as to Count XIV, GRANTS McNeil Leddy's motion to strike, and DENIES Citibank's motion for leave to amend the complaint. The Court also DENIES McNeil Leddy's motion in limine to exclude expert testimony.

Dated at Burlington, in the District of Vermont, this 10th day of December, 2013.


/s/ William K. Sessions III_____
William K. Sessions III
Judge, United States District Court

---

[7] There appears to be some dispute over whether Attorney Rice's anticipated testimony, as disclosed in Citibank's Rebuttal Disclosure, exceeds the scope of expert rebuttal testimony under Fed. R. Civ. P. 26, *see* ECF No. 250.  However, there is no motion before the Court and the Court finds discussion of this matter to be premature.  Therefore, it makes no finding on this issue here.